**ARTHUR MURRAY DANCE STUDIOS OF CLEVELAND, INC.,
Plaintiff, v. WITTER, Defendant.**

Common Pleas Court, Cuyahoga County.

No. 617926.   Decided February 28, 1952.

20

Mendelsohn, Lane & Friedman, Leonard Lane, Cleveland, for plaintiff.

Miller & Hornbeck, W. Rolla Price, Cleveland, for defendant.

## OPINION

By HOOVER, J.

When the defendant, Clifford Witter, a dance instructor, waltzed out of the employment of the plaintiff, the Arthur Murray Dance Studios of Cleveland, Inc., into the employment of the Fred Astaire Dancing Studios, the plaintiff waltzed Witter into court. For brevity, the two studios are called "Arthur Murray" and "Fred Astaire." At the time Witter took his contentious step, Arthur Murray had a string attached to him— a certain contract prohibiting Witter, after working for Arthur Murray no more, from working for a competitor. That Arthur Murray and Fred Astaire are rivals in dispensing Terpsichorean erudition is not disputed. Now Arthur Murray wants the court to pull that string and yank Witter out of Fred Astaire's pedagogical pavilion.

No layman could realize the legal complication involved in Witter's uncomplicated act. This is not one of those questions on which the legal researcher cannot find enough to quench his thirst. To the contrary there is so much authority it drowns him. It is a sea—vast and vacillating, overlapping and bewildering. One can fish out of it any kind of strange support for anything, if he lives so long. This deep and

unsettled sea pertaining to an employee's covenant not to compete with his employer after termination of employment is really Seven Seas; and now that the court has sailed them, perhaps it should record those seas so that the next weary traveler may be saved the terrifying time it takes just to find them

There is the periodical sea: 12 B. U. L. Rev. 273; 1 Calif. L. Rev. 385; 18 Calif. L. Rev. 88; 20 Calif. L. Rev. 607; 23 Calif. L. Rev. 399; 21 Colum. L. Rev. 599; 23 Colum. L. Rev. 164; 28 Colum. L. Rev. 81; 29 Colum. L. Rev. 347; 32 Colum. L. Rev. 291, 294; 47 Colum. L. Rev. 1070; 22 Cornell L. Q. 246; 26 Cornell L. Q. 707; 3 Detroit L. Rev. 38; 36 Geo. L. J. 268; 4 Harv. L. Rev. 128; 31 Harv. L. Rev. 193; 33 Harv. L. Rev. 320; 40 Harv. L. Rev. 326; 41 Harv. L. Rev. 782; 45 Harv. L. Rev. 751; 62 Harv. L. Rev. 1409; 29 Ill. L. Rev. 530; 34 Ill. L. Rev. 365; 11 Ind. L. J. 181; 18 Ia. L. Rev. 546; 21 Ia. L. Rev. 455, 458-461; 31 Ia. L. Rev. 249; 8 J. B. A. Kan. 285; 6 John Marshall L. Q. 491; 23 Ky. L. J. 248; 35 Ky. L. J. 261, 270-274; 76 L. J. 70-71, 85, 97, 109-110, 119-120; 78 L. J. 90; 80 L. J. 115; 97 L. J. 258; 44 Law Q. Rev. 66; 173 L. T. 392; 17 Marq. L. Rev. 230; 32 Marq. L. Rev. 282; 1 Mercer Beasley L. Rev., No. 2, 83; 13 Mich. S. B. J. 63; 2 Minn. L. Rev. 309; 4 Minn. L. Rev. 534; 13 Minn. L. Rev. 59; 16 Minn. L. Rev. 316; 17 Minn. L. Rev. 86; 17 Minn. L. Rev. 444; 22 Minn. L. Rev. 273; 22 Minn. L. Rev. 286; 11 N. Y. U. L. Q. Rev. 470; 13 N. Z. L. J. 205, 221, 241; 8 N. C. L. Rev. 90; 9 N. C. L. Rev. 227; 26 N. C. L. Rev. 402; 16 Notre Dame Law 135; 24 Notre Dame Law. 606; 5 Ohio S. U. L. J. 263; 2 Okla. L. Rev. 82; 7 Ore. L. Rev. 127; 5 Peabody L. Rev. 79; 55 Scot. L. Rev. 108; 66 S. A. L. J. 139; 81 Sol. J. 726; 1 Syracuse L. Rev. 110; 6 Temple L. Q. 114; 9 Temple L. Q. 454; 23 Temple L. Q. 146; 4 Texas L. Rev. 114; 8 Texas L. Rev. 431; 13 U. Detroit L. J. 25; 76 U. Pa. L. Rev. 244, 266; 82nd U. Pa. L. Rev. 872; 90 U. Pa. L. Rev. 855; 7 U. Toronto L. J. 413; 21 Va. L. Rev. 330; 22 Va. L. Rev. 359; 2 Wash. & Lee L. Rev. 106; 41 W. Va. L. Q. 285; 51 W. Va. L. Q. 131; 9 Wis. L. Rev. 309; 25 Yale L. J. 499.

There is the sea of annotations: 9 A. L R. 1456; 20 A. L. R. 861; 29 A. L. R. 1331; 52 A. L. R. 1362; 58 A. L. R. 156; 67 A. L. R. 1002; 98 A. L. R. 963; 119 A. L. R. 1452; 149 A. L. R. 633; 152 A. L. R. 415; 155 A. L. R. 652; 6 L. R. A. N. S. 892; 16 L. R. A. N. S. 389; 24 L. R. A. N S. 933; 26 L. R. A. N. S. 961; 31 L. R. A. N. S. 249; 40 L. R. A. N. S. 473; 8 Ann. Cas. 155; 15 Ann. Cas. 692, 694; Ann. Cas. 1914 A. 500; 1 B. R. C. 502.

There is the sea of encyclopedias: 36 Am. Jur. 529-559, Secs. 50-81; 584- 585, Sec. 108, 658-660, Secs. 201-202 (particularly Secs. 78-79); 28 Am. Jur. 283-290, Secs. 89-97, 293-303, Secs.

101-109 (particularly Sec. 108); 35 Am. Jur. 527-530, Secs. 99-100; 43 C. J. S. 571-576, Sec. 84 c.; 17 C. J. S. 636-638, Sec. 254; 63 C. J. 464-465, Sec. 135; 9 O. Jur. 366-380, Secs. 147-159 (particularly Secs. 151-152); 21 O. Jur. 1045, Sec. 41; 1136-1137, Sec. 96; 26 O. Jur. 254-255, Secs. 133-134; 39 O. Jur. 405-407, Secs. 64-65; 434, Sec. 3.

There is the sea of treatises: 3 Pomeroy's Equity Jur. (5th Ed.) 689, Sec. 934 c; 6 Corbin on Contracts (1951 Ed.) 508-528, Secs. 1392-1395; 1 Williston on Contracts (1936 Ed.) 486, Sec. 137 A; 508, Sec. 141; 5 Ibid. 4040, Sec. 1445; 4042-4043, Sec. 1446; 4584-4585, Sec. 1637; 4585-4591, Secs. 1638-1639; 4606-4612, Sec. 1643; 4623-4628, Sec. 1646; 4647-4648, Sec. 1652; Clark on Contracts (4th Ed.) 429-430; 2 Callmann on Law of Unfair Competition And Trademarks (2nd Ed.) 791-794, Sec. 51.4; 1 Nims on Unfair Competition And Trade Marks (4th Ed.) 421, Sec. 149; 2 Page on Contracts (2nd Ed.) 1372-1374, Sec. 780, 1389-1390, Sec. 789, 1394-1395, Sec. 791; Chitty on Contracts (20th Ed.)· 483-491; Leake on Contracts (8th Ed.) 558- 561; Benjamin on Sale (7th Ed.) 535-543.

There is the restatement sea: 2 Restatement, Contracts, Secs. 513-516, 518; 2 Restatement, Agency, Sec. 396.

There is the digest sea: American Digest, Contracts, Secs. 115-116 (2), 117-118, Injunction, Secs. 60-61 (2), Trade-Marks etc., Sec. 77; West's Ohio Digest (same subjects and sections as in American Digest, supra); Page's Ohio Digest, Contracts, Secs. 94-97, Injunction, Secs. 67, 69; 43 English and Empire Digest, Trade and Trade Unions, Part V.

There is Ohio's own sea—made up of obvious parts of the foregoing.

We trust we are justified in shifting figures of speech long enough to point out how ironic it is that the needles of justice can be buried in so huge a haystack. The average litigant will not find adequate justice in this subject matter until someone devotes a treatise solely to it. It has grown so elephantine yet so intricate that it now needs a complete, detailed treatment for which there is not room in general· treatises on such ominbus subjects as injunctions or contracts.

The main facts are these. Arthur Murray is engaged in the business of teaching dancing. So is Fred Astaire. They are rivals in direct competition. Arthur Murray has two studios in this area. One is in downtown Cleveland at 1515 Euclid Ave. The other is a suburban studio at 13910 Cedar Road, in the Warrensville Road-Cedar Road section of the city of University Heights. The two studios are at least

seven miles apart—as an automobile flies. Fred Astaire has but one studio in the area—on Euclid Avenue in downtown Cleveland not far from Arthur Murray's downtown studio.

There is little evidence about the nature and extent of Arthur Murray's business. He spends $50,000.00 annually for advertising and promotion. There is no evidence to show how far the goodwill of the business extends or from what area either of his studios draws its patrons.

Arthur Murray produced the following evidence as to the training he generally gives his prospective instructors. The prospect is given ten to twelve weeks of training. He is "thoroughly indoctrinated with the methods of teaching as established by Arthur Murray" and "given a thorough sales training." Even after he starts teaching, his own training continues. Occasionally experts come from New York or other studios throughout the country "to impart new methods and new dances to our staff."

How Arthur Murray gets its prospective students is not clear. The evidence seems to indicate that prospects are procured through newspaper, radio and television advertising. There is no evidence that any are secured by any employee going out and personally soliciting them from the public.

When a pupil comes into the studio to take lessons, he is first interviewed by the sales staff. If he decides to buy a course he is turned over to an analyst who handles him for his first five hours of instruction. The analyst plans a tailor-made course for that pupil and then turns him over to an instructor or history teacher who is "responsible for that pupil during his life in the studio." Just what all that responsibility entails is not explained. Arthur Murray recognizes the importance of a pupil dancing with more than one instructor and encourages the practice of the pupil having exchange lessons with other instructors. Appointments are made at the desk. The instructor is supposed to encourage the pupil to take as many lessons as possible each week to get the benefit of regularity of instruction.

Witter started to work for Arthur Murray in March 1949 on a part time basis. No written contract was produced covering the part time period. It is not clear when that period ended and full time employment began, but it seems to have been at the time a written "Employment Agreement" was entered, dated January 11, 1950. Witter's employment ceased shortly thereafter, on April 20, 1950. Witter claims the cessation was involuntary; Arthur Murray claims it was voluntary. The evidence shows that Witter worked at Arthur Murray's Heights Studio. There is no evidence showing that he ever worked at Arthur Murray's downtown studio.

24

By the Employment Agreement Witter was hired as a dancing instructor for one year. It reads in part:

"WHEREAS the Employers conduct a dancing school with studios in the City of Cleveland and have expended and continue to expend large sums of money for the purposes thereof, including the development of methods of dancing and of obtaining pupils and the names of persons interested in dancing and generally in procuring patronage and good-will for their business, and

"WHEREAS the Employers have established unique methods of dancing instruction known as the Arthur Murray Methods of Instruction in Dancing and have attained a high reputation as a nationally known dancing school, and

"WHEREAS the Employers desire to employ the Employee as a dancing instructor or in other capacities, and

"WHEREAS the Employers will train and instruct the Employee in their methods, and disclose to the Employee confidential information as to their methods, the names of their pupils, etc. and desire to make suitable provision that such confidential disclosures shall not be abused, revealed to the Employers' competitors or used by the Employee for his own benefit in competition with the Employers."

*      *      *      *

"3. The Employers will give to the Employee a course of training in dance instruction in order to fit the trainee to teach dancing, or to interview or supervise according to the methods of the Employers. After such course of training is given to the Employee, there will be disclosed to him further information as to the methods of the Employers, the names of pupils and patrons of the Employers, and he will have occasion at the behest of the Employers, to meet such pupils and patrons. Proprietors, managers and all employees of hotels, resorts, ships or establishments of any kind at which the Employers had or may have branch studios, shall among others, be considered patrons of the Employers.

*      *      *      *

"5. The Employee agrees that upon the termination of his employment for any cause and for a period of two (2) years thereafter, he will **not,** teach dancing or accept employment in any manner relating to dancing, dancing engagements, or exhibitions, dancing lessons or instruction or lectures in dancing in any form whatsoever, or become engaged directly or indirectly in business in any respects relating to dancing at any hotel, resort, ship or establishments, nor solicit business for himself or any other business in any manner related to dancing, nor directly nor indirectly engage in teach-

ing of dancing to anyone within a radius of twenty-five (25) miles of Employer without the written consent of Employer.

*      *      *      *

"8. The Employee agrees to pay to the Employers the sum of $750.00 to compensate the Employers for the courses of training given to him at the cost and expense of the Employers, and not by way of satisfaction of any claim for damages for breach of contract, and does herewith deliver to the Employers two separate promissory notes in the sums respectively of $250.00 and $500.00 for such indebtedness. If the Employee within a period of two years after the termination of his employment for any cause, shall either become engaged directly or indirectly in business as a dancing instructor, teacher, supervisor or interviewer, or accept employment in any manner relating to dancing, but not in violation of the provisions of this agreement, said note of $500.00 in payment for training given to the Employee by the Employers shall be payable without further liability on the part of the Employee. If the Employee remains in the employ of the Employers for a period of not less than one year, from the date hereof, as he is required to do, the Employers will cancel and discharge the note for $250.00. The Employers also agree that they will not demand payment of such note for a period of one year from the date hereof, provided the Employee remains in their employ. If the Employee remains in the employ of the Employers for a period of at least one year from the date hereof and thereafter his employment is terminated and he thereafter for a period of two years, observes all of the restrictions and provisions of paragraphs 4 and 5 hereof, then and in that event the Employers will at the end of such two year period cancel and discharge the said note for $500.00. The Employers will not demand payment of the said note during the period of the Employee's employment, nor during the said period of two years thereafter, so long as the Employee continues to observe such restrictions.

"9. The parties hereto, recognizing that irreparable injury will result to the Employers in event of a breach of the terms of this contract on the part of the Employee, agree that in such event the Employers shall be entitled, in addition to any other remedies and damages available, to an injunction to restrain the violation (s) thereof by the Employee, and all persons acting for or with him." * * *

Arthur Murray produced no witness of his own to show what specific training he gave Witter. Witter admitted that

from Arthur Murray he received his training to become a dancing instructor and then became an Arthur Murray instructor; that he was taught "the so-called Arthur Murray method of teaching dancing"; that in all he received about forty to fifty hours as to dancing instruction; that as an instructor he was introduced to students he was to teach; and that at the studio he met the pupils of other instructors.

Here there are large blind spots in the evidence. We are not told how many of his own pupils he taught or how many of other instructors' pupils he taught; nor how he taught them (whether individually or in classes); nor how regularly or often he taught them; nor how many hours he or other instructors spent on his pupils or on other instructors' pupils; nor over how long a period the course of instruction lasts (one month or one year).

Witter testified, without contradiction, that he received little or no sales or business training and that the Arthur Murray sales manuals were not made accessible to him.

Within about six weeks after leaving Arthur Murray, Witter entered the employment of Fred Astaire where he teaches and supervises. In the interim he had a week's employment elsewhere. He approached Fred Astaire. Fred Astaire did not seek him out. At Fred Astaire's, Witter was given three weeks of training before he started to work—a daily training in dancing and sales of three or four hours. He was still receiving training at the time of the trial. There is no evidence that Witter ever engaged in solicitation to get customers either for Arthur Murray or Fred Astaire. Without contradiction, Witter testified:

"Q. Was there any technique or any secret technique of any kind or any sales manuals or dance technique that you have learned at Arthur Murray Studios that you are using at Fred Astaire Dance Studios?

A. No, we didn't have access to that material.

Q. Are you using any of their technique at all at the Fred Astaire Dance Studios today?

A. None whatsoever.

Q. Have you ever solicited or advertised the fact that you were a former Arthur Murray Studio instructor and using that to get business at the Fred Astaire Dance Studios?

A. No.

Q. Have you ever solicited any of the students at the Arthur Murray Studios and taken them to the Fred Astaire Dance Studios?

A. No."

It is stipulated that "the restrictions in said contract in

regard to the two-year time period and the twenty-five mile limitation * * * are valid and reasonable and not unduly in restraint of trade." Other facts will come out in the discussion.

Arthur Murray does not seek damages. He seeks to enjoin Witter from working for Fred Astaire.

Over five hundred years of colorful history look down on this type of litigation. In the year 1415 Henry V was king. Skill in a trade was the vital factor in a man's economic status and it was obtainable only through apprenticeship to an experienced worker. The guild system permitted a man to work only in the trade in which he was apprenticed. Membership in a guild was not easily attained. Travel was difficult. Strangers were not welcome. If a man couldn't work at his trade in his particular locality, he could hardly work at all; might become a pauper; and the public would be deprived of a worker at a time when the Black Death had made workmen scarce. In that background when, in 1415, the celebrated Dyer's Case (Y. B. 2 Henry V, pl. 26) came before Judge Hall (Hull?), he became so enraged by an attempt to restrain a dyer from working in a town for just a half year that in bad French he cursed the deal void: "By God, if the plaintiff were here he should go to prison until he paid a fine to the king." 28 Colum. L. Rev. 81, 82-83; 6 Corbin on Contracts 527, Sec. 1395; **Lange v. Werk, 2 Oh St 520, 526-527.**

Pounded by the pressures of social, economic, industrial, communication and transportational change, the law has changed (7 U. Toronto L. J. 413-415; 26 Cornell L. Q. 707, 708-709; 31 Ia. L. Rev. 249-251; 36 Am. Jur. 530, Sec. 50; 5 Peabody L. Rev. 80-82.) until today, as a rough rule of thumb, the law is that a covenant restraining an employee, on termination of employment, from competing with his former employer, is valid if it is reasonable in view of all of the circumstances of the particular case. 13 U. Detroit L. J. 25, 27; 90 U. Pa. L. Rev. 855, 856; 33 Harv. L. Rev. 320; 31 Ia. L. Rev. 249, 253; 32 Marq. L. Rev. 282, 283; 5 Williston on Contracts 4580, Sec. 1636; 36 Am. Jur. 532, Sec. 51; 3 Pomeroy's Equity Jur. 689, Sec. 934 c.

Such a statement, however, is misleading as over-simplification always is. Reasonableness, like Johnny's being a "good" boy, is complicated. Immediately it breaks down into three divisions (then into numerous subdivisions), and one must consider whether the restraint is reasonable as to (1) the employer, (2) the employee and (3) the public. **9 O. Jur. 370-371, Sec. 151;** 17 C. J. S. 636-637, Sec. 254; 40 Harv. L. Rev. 326, 327; 16 Minn. L. Rev. 316, 317; 22 Minn. L. Rev. 273,

**28**

274; 32 Marq. L. Rev. 282, 283; 81 Sol. J. 726; 51 W. Va. L. Q. 131, 132; 5 Williston on Contracts 4580-4581, Sec. 1636. More elaborately, three questions are usually propounded:

1. Is the restraint reasonable in the sense that it is no greater than necessary to protect the employer in some legitimate interest? 5 Williston on Contracts 4581, Sec. 1636; Ann. Cas. 1914 A 500; 2 Page on Contracts (1920 Ed.) 1389, Sec. 789; 9 A. L. R. 1456, 1467; **Briggs v. Butler, 140 Oh St 499, 507;** 2 Restatement, Contracts, Sec. 515 (a).

2. Is the restraint reasonable in the sense that it is not unduly harsh and oppressive on the employee? 3 Detroit L. Rev. 38, 43; 24 Notre Dame Law. 606, 607; 6 Corbin on Contracts 522-524, Sec. 1394, 526, Sec. 1395; 2 Restatement, Contracts, Sec. 515 (b); **Gates-McDonald Co. v McQuilkin, 33 Abs 481;** Standard Oil Co. v. Bertelsen, 186 Minn. 483, 487; McCluer v. Super Maid Cook-Ware Corp., 62 F. 2nd 426, syl. 1.

3. Is the restraint reasonable in the sense that it is not injurious to the public? 31 Ia. L. Rev. 249, 254; 17 C. J. S. 636-637, Sec. 254; 24 Notre Dame Law. 606, 607-608; 5 Williston on Contracts 4579-4580, Sec. 1635, 4581-4582, Sec. 1636, 4608, Sec. 1643; 36 Am. Jur. 533-534, Secs. 52-53; 5 Peabody L. Rev. 80, 82; Tarr v. Stearman, 264 Ill. 110, syl. 4, 5; Parish v. Schwartz, 344 Ill. 563, 568, 570; Kadis v. Britt, 224 N. C. 154, 159-160; Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 471, 473-474; Keeler v. Taylor, 53 Pa. 467, 470, syl. 3; Ridley v. Krout, 63 Wyo. 252, 278-279; Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 553; Marshall v. Irby, 203 Ark. 795, 797; Orkin Exterminating Co. etc. v. Dewberry, 204 Ga. 794.

In determining what is reasonable, the Goddess of Justice that hovers over the American court house with scale in hand has a delicate job of weighing; and it is a three—not a two—pan scale for she must balance the conflicting interests of employer, employee and public. 6 Corbin on Contracts 514, Sec. 1394, 526, Sec. 1395; 31 Harv. L. Rev. 193, 195; 11 Ind. L. J. 181, 182; 47 Colum. L. Rev. 1070, 1071; 16 Notre Dame Law. 135, 136. Hers is the tedious task of reconciling the head-on clash of various, very basic policies, namely: freedom of contract, freedom of trade, sanctity of contract, individual liberty, protection of business, right to work, making of training available to employee, earning of livelihood for one's self and family, utilization of one's skill and talent, continued productivity, betterment of one's status, avoidance of one's becoming a public charge, encouragement of competition and discouragement of monopoly. Last five citations and 51 W. Va. L. Q. 131, 132-133; 2 Wash. & Lee L. Rev. 106, 111;

13 Minn. L. Rev. 59; 22 Minn. L. Rev. 273, 274; 76 U. Pa. L. Rev. 244, 253-255; 41 Harv. L. Rev. 193, 195; 24 Notre Dame Law. 606, 607; 5 Peabody L. Rev. 79, 87, N. 47; 21 Colum. L. Rev. 599; 17 Marq. L. Rev. 230; 23 Colum. L. Rev. 164, 166; 5 Williston on Contracts 4578-4580, Sec. 1635, 4647, Sec. 1652; Abalene Exterminating Co. etc. v. Elges, 137 N. J. Eq. 1, 3; Ridley v. Krout, 63 Wyo. 252, syl. 3; Granger v. Craven, 159 Minn. 296, 299. There is no such thing as unlimited freedom of contract. 9 O. Jur. 337; 6 Corbin on Contracts 526, Sec. 1395. Courts too well know that freedom can be pushed to a point at which freedom is destroyed. 26 Cornell L. Q. 707, 708-709, N. 7. One cannot protect himself against everything. 25 Yale L. J. 499, 500; 26 Cornell L. Q. 707, 712, N. 16; 76 U. Pa. L. Rev. 244, 256; 2 Restatement, Contracts, Sec. 516, Comment h. In this titanic struggle for protection, one cannot but sympathize with both employer and employee. Each is needled by need; each plagued by peril. 6 Corbin on Contracts, 514, Sec. 1394; 41 Harv. L. Rev. 782, 784. One cannot condemn either for seeking protection.

A rule of reason must necessarily be vague in outline, (2 Restatement, Contracts, Sec. 515, Comment a.; 18 Ia. L. Rev. 546, 547) flexible, (3 Pomeroy's Equity Jur. 688-689, Sec. 934 c.; 16 Notre Dame Law. 135, 137) and difficult of application (26 Cornell L. Q. 707, 709). It is impossible to lay down any general rule. 44 Law Q. Rev. 66, 69. Each case must be determined on its own particular facts. **Briggs v. Butler, 140 Oh St 499, 510**; Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 473; Standard Oil Co. v. Bertelsen, 186 Minn. 483, 484; 3 Pomeroy's Equity Jur. 687, 689, Sec. 934 c.; 31 Ia. L. Rev. 249, 254; 22 Minn. L. Rev. 273, 274; 5 Peabody L. Rev. 79; 36 Am. Jur. 555, Sec. 79; 81 Sol. J. 726, 727. Reasonableness is gauged not just by some but by all of the circumstances. 3 Detroit L. Rev. 38, 43; 6 John Marshall L. Q. 491, 493; 16 Notre Dame Law. 135, 138; 6 Corbin on Contracts 527-528, Sec. 1395; 17 C. J. S. 642, Sec. 257. The same identical contract and restraint may be reasonable and valid under one set of circumstances, and unreasonable and invalid under another set of circumstances. Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 471; 6 John Marshall L. Q. 491, 493; 44 Law Q. Rev. 66, 69. **Briggs v. Butler, 140 Oh St 499,** 507 quotes 17 C. J. S. 637, Sec. 254 to the effect that contracts of the type in question have frequently been upheld as to salesmen, agents, canvassers and other employees. To be accurate it should be added that they are also frequently not upheld. 6 Corbin on Contracts 514-516, Sec. 1394. Danger of the gravest injustice lurks in the unguarded use of such

30

potentially deceiving generalities. It cannot be too strongly stated and restated that every case depends on its own peculiar circumstances. In sailing the above seven seas more Ships of Justice have gone down for failure to sense the treacherous reefs of generality than for any other reason.

In this type of case, heavy procedural burdens impede the plaintiff employer. Because the restraint sought to be imposed is one which restricts the exercise of a gainful occupation, it is a restraint in trade. 5 Williston on Contracts 4576, Sec. 1633; 2 Restatement, Contracts, Sec. 513; Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467; **Gates-McDonald Co. v. McQuilkin, 33 Abs 481, 483.** It is cautiously considered, carefully scrutinized, looked upon with disfavor, strictly interpreted and reluctantly upheld. **21 O. Jur. 1133, Sec. 95;** 5 Williston on Contracts 4583, Sec. 1636; 26 Cornell L. Q. 707, 711, N. 15; 3 Detroit L. Rev. 39, 40, 41; 22 Minn. L. Rev. 286, 287; 24 Notre Dame Law. 606, 608; 24 L. R. A. N. S. 933, 934; Ry. Audit & Inspection Co., Inc. v. Pendleton, 175 La. 4, syl. 1; Kaumagraph Co. v. Stampagraph Co., Inc., 188 N. Y. S. 678, syl. 5, affirmed 235 N. Y. 1; Granger v. Craven, 159 Minn. 296, 299; Koppers Products Co. v. Readio, 60 R. I. 207, syl. 4; Abalene Exterminating Co. etc. v. Elges, 137 N. J. Eq. 1, 3. Being a contract in restraint of trade it is presumptively void. The employer shoulders the burden of proving the restraint reasonable and the contract valid. **Lange v. Werk, 2 Oh St 520, syl. 1, 2; Lufkin Rule Co. v. Fringeli, 57 Oh St 596, 602-603; 9 O. Jur 373, Sec. 152; 27 O. Jur. 170, Sec. 10, 172, Sec. 12;** 36 Am. Jur. 531, Sec. 50; 2 Callmann on Law of Unfair Competition and Trade-Marks 793, Sec. 51.4; Leake on Contracts 560; Chitty on Contracts 484; 44 Law Q. Rev. 66; 81 Sol. J. 726, 727; 55 Scot. L. Rev. 108; 21 Colum. L. Rev. 599, 600; 11 Ind. L. J. 181, 182; 1 Syracuse L. Rev. 110, 116; 36 Geo. L. J. 268, 269; 2 Okla. L. Rev. 82, 83; 9 Temple L. Q. 454, 455; 51 W. Va. L. Q. 131, 134; Ridley v. Krout, 63 Wyo. 252, 268-269, syl. 8; Super Maid Cook-Ware Corp. v. Hamil, 50 F. 2nd 830, 831, syl. 1, cer. den. 284 U. S. 677; Mandeville v. Harman, 42 N. J. Eq. 185, 189-190; Byers v. Trans-Pecos Abstract Co., 18 S W 2nd (T. C. A.) 1096, 1098, syl. 3; Molina v. Barany, 56 N. Y. S. 2 124, 131, syl. 5; May v. Lee, 28 S W 2nd (T. C. A.) 202, 205, syl. 3; Roy v. Bolduc, 140 Me. 103, 108; McCluer v. Super Maid Cook-Ware Corp., 62 F. 2nd, 426, 429, syl. 2; Kadis v. Britt, 224 N. C. 154, 160, syl. 1; Kaumagraph Co. v. Stampagraph Co., 235 N. Y. 1, 10; Corpin v. Wheatley, 237 N. Y. S. 205, 206. Even where the restraint is partial, the rule is not that it is good, but that it may be good. Mandeville v. Harman, 42 N. J. Eq. 185, 189; **21 O. Jur. 1133, Sec. 95.** The fact that an employer has a written agree-

ment that the employee will not, on leaving his employment, compete with his employer, that the employee breaks that agreement, that the employee quits his employer, that the employee starts working for a rival, and that the rival thereby becomes a more efficient competitor,—all this, without more, does not automatically entitle the employer to an injunction. 6 Corbin on Contracts 520, Sec. 1394; 31 Ia. L. Rev. 249, 253, N. 42; 3 Detroit L. Rev. 38, 41; 43 C. J. S. 572-573, Sec. 84; 28 Am. Jur. 216, Sec. 23; Menter Co. v. Brock, 147 Minn. 407, 410; Club Aluminum Co. v. Young, 263 Mass. 223. Heflebower v. Sand, 71 F. Supp. 607, 614; Sternberg v. O'Brien, 48 N. J. Eq. 370, 376; Oppenheimer v. Hirsch, 38 N. Y. S. 311, 313; McCluer v. Super Maid Cook-Ware Corp. 62 F. 2nd 426, syl. 4; Corpin v. Wheatley, 237 N. Y. S. 205. Compare **Lange v. Werk, 2 Oh St 520.** Since this is an equitable action, the employer must establish the standard requirements for equitable intervention. 11 Ind. L. J. 181, 182. Remedy by injunction is frequently called the strong arm of the law, and is often characterized as summary, peculiar, high or extraordinary. **21 O. Jur. 990, Sec. 7; Cleveland v. Division 268 etc., 84 Oh Ap (Cuyahoga County) 43, 45.** For that reason and because of the danger it may bring, it is exercised sparingly, cautiously and only after thoughtful deliberation. **21 O. Jur. 1007-1008, Sec. 18;** 28 Am. Jur. 217, Sec. 24; Menter Co. v. Brock, 147 Minn. 407, 411. Plaintiff has the burden of establishing all the material facts which are essential to injunctive relief. **16 O. Jur. 47, Sec. 18; 21 O. Jur. 1277, Sec. 202;** 28 Am. Jur. 218, Sec. 24; 43 C. J. S. 884, Sec. 190 b.; 2 Lawrence on Equity Jur. 1189, Sec. 1105; May v. Lee, 28 S. W. 2nd, 202, 205, syl. 4. Plaintiff's right to an injunction must be clear. **21 O. Jur. 1133, Sec. 95, 1280, Sec. 204;** 43 C. J. S. 889-890, Sec. 192; 28 Am. Jur. 217, Sec. 24; 2 Lawrence on Equity Jur. 1189, Sec. 1105; 51 W. Va. L. Q. 131, 133; 47 Colum. L. Rev. 1070, 1071; **Cleveland v. Division 268 etc., 84 Oh Ap 43, 46;** Standard Oil Co. v. Bertelsen, 186 Minn. 483, 484, 487, syl. 2. Where the right is doubtful, injunction is denied. **21 O. Jur. 1076, Sec. 64;** 43 C. J. S. 431, Sec. 19, 890, Sec. 192; 28 Am. Jur. 217, Sec. 24; Koppers Products Co. v. Readio, 60 R. I. 207, syl. 7; Albright v. Teas, 37 N. J. Eq. 171, 173; Gordon Supply Co. v. Galuska, 113 N. J. Eq. 353, 355. Granting of an injunction rests in the sound—not the arbitrary—discretion of the court. Allowance is not a matter of strict right. **16 O. Jur. 47, Sec. 18; 21 O. Jur. 1006, Sec. 17;** Standard Oil Co. v. Bertelsen, 186 Minn. 483, 484. Injunction is denied unless the whole matter appears equitable. The covenant standing alone is not the test but the covenant in

its relation to the contract and to the situation in which it is sought to be enforced. Gates-McDonald Co. v. McQuilkin, 33 Abs 481, 483; Super Maid Cook-Ware Corp. v. Hamil, 50 F. 2nd 830, 831, cer. den. 284 U. S. 677; Molina v. Barany, 56 F. 2nd 124, 131; Ridley v. Krout, 63 ·Wyo. 252, 269; 9 Temple L. Q. 454, 455, n. 1.

An employer seeking an injunction in a case like this is suddenly confronted with at least the following questions (some of which obviously overlap):

First. Are the ordinary elements of a contract present, such as consideration, etc.? Since relief is based on a covenant in a contract, the basis crumbles if there is no contract. Lange v. Werk, 2 Oh St 520, syl. 2; 9 O. Jur. 373, Sec. 152; 6 Corbin on Contracts 522, Sec. 1394, 525-528, Sec. 1395; 36 Am. Jur. 536-537, Sec. 56; 5 Williston on Contracts 4583-4584, Sec. 1636; 152 A. L. R. 415, 419; 23 Temple L. Q. 146;.5 Peabody L. Rev. 79, 90; 17 C. J. S. 641-642, Sec. 257; Pestel Milk Co. v. Model Dairy Products Co., 39 Abs 197, 211, syl. 6.

Second. Is the restraint reasonable in the sense that it is no greater than necessary to protect the employer in some legitimate interest? See authorities cited under statement of this question supra. If it is greater, generally it is held invalid. Briggs v. Butler, 140 Oh St 499, 507; 17 C. J. S. 637-638, Sec. 254; 5 Williston on Contracts 4581, Sec. 1636; 26 Cornell L. Q. 707, 711, N. 16; 2 Restatement, Trusts, Sec. 515 (a); 36 Am. Jur. 536, Sec. 55, 554-555, Sec.· 78, 555-556, Sec. 79; 32 Marq. L. Rev. 282, 283; Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467,·470, 473, syl. 2. In Briggs v. Butler, 140 Oh St 499, 507, it is said:

"The determination of the necessity for such restriction is dependent upon the nature and extent of the business and the nature and extent of the service of the employee in connection therewith and other pertinent conditions."

No court seems to have attempted to make a list of those "other pertinent conditions." Indeed, if it were possible to make a complete list today, human ingenuity would render the list obsolete tomorrow. However, the interests of justice should warrant one's recording some of the important conditions which the cases consider. Preliminarily perhaps one should caution against an assumption some times erroneously made, i. e., that the restrictions on time and area are alone to be considered. In 2 Page on Contracts 1389, Sec. 789, it says:

"The doctrine that restraint is void if unreasonable is not limited to area. If for any reason the restraint is greater than is necessary to protect the good will, the contract is invalid."

In 24 Notre Dame Law. 606, it says:

"There are numerous decisions to the effect that in order for a contract of this nature to be valid, it must be reasonable as to time and place, **and not otherwise unreasonable.** If the contract is unreasonable in any one of these particulars, it is invalid."

See also 2 Restatement, Contracts, p. 990, Sec. 515, com. c.

With that as a background, we shall set forth some of the circumstances that, with varying degrees of effect on the ultimate result, courts have considered. We shall handle them in question form (some obviously overlap):

1. Does the employer have a protectible interest? 5 Williston on Contracts 4581; 36 Am. Jur. 531, Sec. 50; 6 Corbin on Contracts 517-518, Sec. 1394; 28 Am. Jur. 297, Sec. 102; 21 Colum. L. Rev. 599, 600; 3 Detroit L. Rev. 38, 43; 25 Yale L. J. 499, 500; 17 C. J. S. 639, Sec. 254; 20 A. L. R. 861; Club Aluminum Co. v. Young, 263 Mass. 223, 226; Molina v. Barany, 56 N. Y. S. 2nd, 124, 130; Tarr. v. Stearman, 264 Ill. 110, syl. 7; Donohue v. Peterson, 161 Ore. 65, 73.

2. Is the covenant ancillary or incidental to some other transaction? 5 Williston on Contracts 4582, Sec. 1632; 17 C. J. S. 629, Sec. 246, 639, Sec. 254; 36 Am. Jur. 534-535, Sec. 54.

3. What is the object of the parties? 36 Am. Jur. 531, Sec. 50.

4. Is the real object merely to remove a competitor and ordinary competition? 17 C. J. S. 629, Sec. 246; 76 U. Pa. L. Rev. 244, 254; 6 Corbin on Contracts 520, Sec. 1394; Clark Paper & Mfg. Co. v. Stenacher, 236 N. Y. 312, 320-321; Murray v. Cooper, 51 N. Y. S. 2nd 935, 937; Heflebower v. Sand, 71 F. Supp. 607, 613; Kadis v. Britt, 224 N. C. 154, 159.

5. Is the real object just to prevent the employee from quitting, or to suppress or discipline him? 76 U. Pa. L. Rev. 244, 271; 1 Syracuse L. Rev. 110, 116; 4 Texas L. Rev. 114; 28 Am. Jur. 303, Sec. 109, Sternberg v. O'Brien, 48 N. J. Eq. 370, 373; Clark Paper & Mfg. Co. v. Stenacher, 236 N. Y. 312, 321; Heflebower v. Sand, 71 F. Supp. 607, 611, 613; Ridley v. Krout, 63 Wyo. 252, 277.

6. Is the real object to cause the employee to withdraw from all business? 5 Williston on Contracts 4647, Sec. 1652; 40 L. R. A. N. S. 473; 36 Am. Jur. 555, Sec. 79, N. 11; 17 C. J. S. 636 Sec. 254; 51 W. Va. L. Q. 131, 133.

7. Is the real object merely to prevent employee from using the skill and intelligence acquired or increased through experience or instruction received in course of work for employer? 5 Williston on Contracts 4648, Sec. 1652; 25 Yale L. J. 499, 500; 2 Restatement, Contracts, p. 1001, Sec. 516, com. h.;

Ridley v. Krout, 63 Wyo. 252, 272-274; Club Aluminum Co. v. Young, 263 Mass. 223, 226-227.

8. What is the nature and extent of employer's business? **Briggs v. Butler, 140 Oh St 499, 507;** 5 Williston on Contracts 4581, Sec. 1636, 4612, Sec. 1643; 6 Corbin on Contracts 517-518, Sec. 1394; 31 Ia. L. Rev. 249, 254; 3 Detroit L. Rev. 38, 43; 81 Sol. J. 726, 729; 24 Notre Dame Law. 606; Clark on Contracts 421; 36 Am. Jur. 531, Sec. 50, 533, Sec. 52; 44 L. Q. Rev. 66, 68.

9. What was the nature and extent of employee's work in employer's business? **Briggs v. Butler, 140 Oh St 499, 507;** 36 Am. Jur. 531, Sec. 50, 554, Sec. 78, 555, Sec. 79; 6 Corbin on Contracts 518, Sec. 1394; Clark on Contracts 421; 81 Sol. J. 726, 727; 97 L. J. 258; 44 L. Q. Rev. 66, 68; 20 A. L. R. 861, 867-868; 4 Texas L. Rev. 114; 8 Ann. Cas. 155; 9 A. L. R. 1456, 1461; 24 Notre Dame Law. 606; 3 Detroit L. Rev. 38, 43; 31 Ia. L. Rev. 249, 254; 66 S. A. L. J. 139, 148; Heflebower v. Sand, 71 F. Supp. 607; Simms v. Burnette, 55 Fla. 702; Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467; Sternberg v. O'Brien, 48 N. J. Eq. 370; Burroughs Adding Mach. Co. v. Chollar, 79 S. W. 2nd 344.

10. How long had employee worked for employer? Sternberg v. O'Brien, 48 N. J. Eq. 370, 371, 378; Simms v. Burnette, 55 Fla. 702, 706; 31 L. R. A. N. S. 249, 253; Club Aluminum Co. v. Young, 263 Mass. 223, 225.

11. Are employee's services unique in character, or can employee's place be readily filled? Absence of uniqueness does not necessarily prevent employer from obtaining an injunction; however its presence may be of help in obtaining an injunction. Isn't it self-evident that if the individual Arthur Murray actually taught for the plaintiff corporation under a similar contract and quit to teach for a local rival it would be entirely different than Clifford Witter doing so? **Briggs v. Butler, 140 Oh St 499, 510-511;** 6 Corbin on Contracts 519-520, Sec. 1394; 28 Am. Jur. 303, Sec. 109; 2 Restatement, Contracts, Sec. 516, p. 1001, comment h.; 26 Cornell L. Q. 707, 708 N. 1, 710-711; 2 Wash. & Lee L. Rev. 106, 111; Menter v. Brock, 147 Minn. 407, 409, 411-412.

12. Did employee's work give him opportunity to become acquainted with employer's customers? **Briggs v. Butler, 140 Oh St 499, 507;** 11 Ind. L. J. 181, 183.

13. How many of employer's customers did employee come to know? Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 471-472; National Linen Service Corp. v. Clower, 179 Ga. 136, 140.

14. Was this particular employee practically the employer's

sole and exclusive contact with the customer? 35 Ky. L. J. 261, 273; Deuerling v. City Baking Co., 155 Md. 280, 287-288; Racine v. Bender, 141 Wash. 606, 608-609; Eureka Laundry Co. v. Long, 146 Wis. 205, 209.

15. Was employee's contact with employer's customers a regular, re-occurring contact? 20 A. L. R. 861, 867-868; 97 L. J. 258; 5 Peabody L. Rev. 79, 86; 36 Geo. L. J. 268, 269; Roy v. Bolduc, 140 Me. 103, 105; Byers v. Trans-Pecos Abs. Co., 18 S. W. 2nd (T. C. A.) 1096, 1098; Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 471; Heflebower v. Sand, 71 F. Supp. 607, 613; Super Maid Cook-Ware Corp. v. Hamil, 50 F. 2nd 830, 831.

16. Was employee's contact with employer's customers a close, personal, direct and ingratiating contact that gave employee such a hold on customers that they would follow him to the rival? Heflebower v. Sand, 71 F. Supp. 607, 611, 612, 613; 9 A. L. R. 1456, 1461; Racine v. Bender, 141 Wash. 606, 608, 614; Sternberg v. O'Brien, 48 N. J. Eq. 370, 377-380; Ridley v. Krout, 63 Wyo. 252, 269-270, 277.

17. Would employer's customers know that employee had quit and joined the rival? Heflebower v. Sand, 71 F. Supp. 607, 613.

18. What is the distance between the business place at which employee worked for employer and the business place at which employee works for rival? Scherman v. Stern, 93 N. J. Eq. 626, 628; Howard v. Danner, 17 Times L. R. 548; 5 Peabody L. Rev. 79, 86; Lantieri Beauty Salon v. Yale, 7 N. Y. S. 2nd 984; 986, syl. 4 (held 18 block prohibition unreasonable as distinguished from 1 block).

19. Does employee contact and serve customer at customer's premises or at employer's premises? 35 Ky. L. J. 261, 273; Racine v. Bender, 141 Wash. 606, 608; 66 S. A. L. J. 147, 148.

20. Is employee's work a route or non-route type? Heflebower v. Sand, 71 F. Supp. 607, 611, 612; Menter Co. v. Brock, 147 Minn. 407, 410-411; Byers v. Trans-Pecos Abstract Co., 18 S. W. 2nd 1096, 1099; 8 U. Detroit L. J. 39, 40; Super Maid Cook-Ware Corp. v. Hamil, 50 F. 2nd. 830, 831.

21. Does employee's work involve solicitation, i. e., seeking out people to procure them as customers? **Briggs v. Butler, 140 Oh St 499, 501, 506, syl. 3**; City Ice Del. Co. v. Evans, 275 S. W. (T. C. A.) 87, 89; Sternberg v. O'Brien, 48 N. J. Eq. 370, 377; 32 Marq. L. Rev. 282, 284; Interstate Tea Co., Inc. v. Alt, 271 N. Y. 76, 80.

22. What is the nature and extent of employee's work for rival? 6 Corbin on Contracts 518, Sec. 1394; **Briggs v. Butler, 140 Oh St 499, 507**; Southern Properties, Inc. v. Carpenter, 21

S. W. 2nd 372, syl. 6; Standard Oil Co. v. Bertelsen, 186 Minn. 483, 486; Kadis v. Britt, 224 N. C. 154, 158.

23. On behalf of rival, did employee solicit and attempt to entice away the patronage of customers that he had served for employer? 6 Corbin on Contracts 522, Sec. 1394; **Briggs v. Butler, 140 Oh St 499, 506 syl. 3;** Roy v. Bolduc, 140 Me. 103, 106; Murray v. Cooper, 51 N. Y. S. 2nd 935, 936; Orkin Exterminating Co. etc. v. Dewberry, 204 Ga. 794, 801; **Fed. Sanitation Co. v. Frankel, 34 Oh Ap 331, 332;** 22 Minn. L. Rev. 286-287; 31 L. R. A. 249, 250-252; 16 L. R. A. N. S. 389- 390; Lantieri Beauty Salon, Inc. v. Yale, 7 N. Y. S. 2nd 984, 985, syl. 3.

24. Did employee actually entice away and divert to rival, customers he had served for employer? **Briggs v. Butler, 140 Oh St 499, 506;** Deuerling v. City Baking Co., 155 Md. 280, 282; Heflebower v. Sand, 71 F. Supp. 607, 612, 613; Roy v. Bolduc, 140 Me. 103, 106; Club Aluminum Co. v. Young, 263 Mass. 223, 226, 228; Racine v. Bender, 141 Wash. 606, 609; National Linen Service Corp. v. Clower, 179 Ga. 136, 141; Standard Oil Co. v. Bertelsen, 186 Minn. 483, 486; Lantieri Beauty Salon, Inc. v. Yale, 7 N. Y. S. 2nd 984, 986.

25. How many of such customers did employee lure away? Standard Oil Co. v. Bertelsen, 186 Minn. 483, 486; Racine v. Bender, 141 Wash. 606, 609; Molina v. Barany, 56 N. Y. S. 2nd 124, 129, 133; Saltman v. Smith, 313 Mass. 135, 139.

26. Did employee obtain and is he using employer's secret customer list? 2 Restatement, Agency, p. 898, Sec. 396, com. b.; 2 Restatement, Contracts, p. 1001, Sec. 516, com. h.; 5 Williston on Contracts 4624, Sec. 1646; 34 Ill. L. Rev. 365; Roy v. Bolduc, 140 Me. 103, 106; Kadis v. Britt, 224 N. C. 154, 162, syl. 6; Deuerling v. City Baking Co., 155 Md. 280, 281-282; Corpin v. Wheatley, 237 N. Y. S. 205, 206.

27. Have employer's trade or business secrets been confided to employee? 17 C. J. S. 637, Sec. 254, N. 50, Par. (1); 43 C. J. S. 573, Sec. 84; 2 Restatement, Contracts, p. 1001, Sec. 516, com. h.; 2 Callmann on Law of Unfair Competition And Trade-Marks, 794- 795, Sec. 51.4; 6 Corbin on Contracts 518, 520, Sec. 1394; 8 Ann. Cas. 155, 156; 2 Page on Contracts 1390, Sec. 789; 36 Amer. Jur. 556, Sec. 79; 44 L. Q. Rev. 66, 67-68; Corpin v. Wheatley, 237 N. Y. S. 205, 206; Ridley v. Krout, 63 Wyo. 252, 269-272.

28. Was the purpose of employee's subsequent employment by rival the obtaining of such secrets? 31 L. R. A. N. S. 249, 250; 43 C. J. S. 573, Sec. 84; Sherman v. Pfefferkorn, 241 Mass. 468, 477.

29. What territory does employer's business cover? Standard Oil Co. v. Bertelsen, 186 Minn. 483, 484; Orkin Exterminating Co. etc. v. Dewberry, 204 Ga. 794, 795, 805.

30. What territory did employee cover for employer? Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 472; Orkin Exterminating Co. v. Dewberry, 204 Ga. 794, 801.

31. From what territory does the covenant bar employee? 36 Am. Jur. 555, Sec. 79.

32. Is employee barred from territory in which employer has no business? 6 Corbin on Contracts 517- 518, Sec. 1394; 5 Williston on Contracts 4581, Sec. 1636, 4612, Sec. 1643; 32 Marq. L. Rev. 282, 284; 5 Peabody L. Rev. 79, 87; Knapp v. S. Jarvis Adams Co., 135 F. 1008, syl. 4; 76 U. Pa. L. Rev. 244, 271; 8 Ann. Cas. 155-156; Orkin Exterminating Co. etc. v. Dewberry, 204 Ga. 794, 801, 805-807.

33. Is employee barred from territory in which he never worked for employer? 6 Corbin on Contracts 518, Sec. 1394; 32 Marq. L. Rev. 282, 284; 9 Wis. L. Rev. 309, 310, 311; Wis. Ice & Coal Co. v. Lueth, 213 Wis. 42, syl. 2, 3; Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 255; Gordon Supply Co. v. Galuska, 113 N. J. Eq. 353, 354, 355.

34. What is the size and condition of the area over which the prohibition extends? Is it urban or rural? Is it metropolitan or small city? Is it thinly or densely populated? 36 Am. Jur. 554, Sec. 78; 8 Ann. Cas. 155; 66 S. A. L. J. 139, 148; 76 L. J. 70-71, 85; 97 L. J. 258; 5 Peabody L. Rev. 79, 84, 86; 78 L. J. 90; George Weston Ltd. v. Baird, 37 Ont. L. 514, 516, 517, 522; Marshall v. Irby, 203 Ark. 795, 797; Orkin Exterminating Co. etc. v. Dewberry, 204 Ga. 794, 806-807; Eureka Laundry Co. v. Long, 146 Wis. 205, 209.

35. What is the duration of the prohibition? 36 Am. Jur. 554, Sec. 78; 8 Ann. Cas. 155. See 5 Peabody L. Rev. 79, 84 for suggestion of test as to reasonableness of time prohibition.

36. What is the character of work from which employee is excluded? 20 A. L. R. 861, 867-869; 2 Restatement, Contracts, p. 991, Sec. 515, ill. 4; 5 Williston on Contracts 4612, Sec. 1643, 4680, Sec. 1659; 6 Corbin on Contracts 518, Sec. 1394; 2 Page on Contracts 1389-1390, Sec. 789; 17 Minn. L. Rev. 86, 87; 5 Peabody L. Rev. 79, 86; 51 W. Va. L. Q. 131, 133; 31 Ia. L. Rev. 249, 254; Sternberg v. O'Brien, 48 N. J. Eq. 370, 373.

37. From what persons or class of persons is employee excluded from doing business? 5 Williston on Contracts 4680, Sec. 1659; 6 Corbin on Contracts 517, Sec. 1394; 17 Minn. L. Rev. 86, 87; 6 John Marshall L. Q. 491, 493; 13 N. Z. L. J. 205, 207; 76 L. J. 109-110; Murray v. Cooper, 51 N. Y. S. 2nd 935, 936; Southern Properties, Inc. v. Carpenter, 21 S. W. 2nd 372, syl. 6; **Gates-McDonald Co. v. McQuilkin, 33 Abs 481, 483.**

38. Are the circumstances such as to require radius pro-

tection or merely non-solicitation of employer's customers that employee had served? 2 Callmann on Law of Unfair Competition and Trade-Marks 871, Sec. 59.1; 55 Scot. L. Rev. 108-110; 76 L. J. 70-71; Deuerling v. City Baking Co., 155 Md. 280, 283, syl.; Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 255; Interstate Tea Co., Inc. v. Alt., 271 N. Y. 76, syl.; Molina v. Barany, 56 N. Y. S. 2nd 124, 127, 128, 134, syl. 19; Witkop & Holmes Co. v. Boyce, 112 N. Y. S. 874, 881; 1 Syracuse L. Rev. 110, 115-116; 26 Cornell L. Rev. 707, 711; 28 Colum. L. Rev. 81, 86; **Gates-McDonald Co. v. McQuilkin, 33 Abs 481, 484.** In 6 Corbin on Contracts 524-525, Sec. 1394 it says:

"The injunction may * * * prevent the disclosure of secrets or the solicitation of old customers without requiring the employee to refrain wholly from renewing employment in the same vicinity."

39. Has employee been guilty of deception, bad faith, fraud or specific misconduct? **Briggs v. Butler, 140 Oh St 499, 505-506;** Molina v. Barany, 56 N. Y. S. 2nd 124, 130, 131; Murray v. Cooper, 51 N. Y. S. 2nd 935, 936; 20 A. L. R. 861; 3 Detroit L. Rev. 38, 43; Super Maid Cook-Ware Corp. v. Hamil, 50 F. 2nd 830-831.

40. What actual business loss was caused to employer by employee's working for rival? City Ice Delivery Co. v. Evans, 275 S. W. 2nd 87, 89 (daily delivery in district dropped from 1½ tons to 100 pounds); Heflebower v. Sand, 71 F. Supp. 607, 612-613; Standard Oil Co. v. Bertelsen, 186 Minn. 483, 486; Scherman v. Stern, 93 N. J. Eq. 626, 631; Paragon Oil Co. v. Familton, 5 N. P. 23, 25-26; 8 U. Detroit L. J. 39, 41; 6 Corbin on Contracts 522, Sec. 1394. See also Galucha v. Naso, 147 Ia. 309, 311.

41. How many other rivals are engaged in the same business in the community? Is the business common or unusual in nature? **Briggs v. Butler, 140 Oh St 499, 510;** Magid v. Tannenbaum, 149 N. Y. S. 445, 446.

**Third.** Is the restraint reasonable in the sense that it is not unduly harsh and oppressive on employee? See authorities cited under statement of this question supra. If it is unduly harsh and oppressive, generally it is held invalid. There is a close relationship between the "second" question and this "Third" one. Frequently courts say something like this, found in Heflebower v. Sand, 71 F. Supp. 607, 613:

"It is true that plaintiffs in the good will of their business **have a legitimate interest to protect. However,** the protection they exact therefor fails to meet the test of reasonableness * * * in that it is clear that **such interest needed no protection from the defendant, Sand."**

Granger v. Craven, 159 Minn. 296, 302. Obviously many of the above-noted individual circumstances that are pertinent to question "Second" are equally pertinent to question "Third." There is a certain correlativity between the two. A restraint that over-protects is likely to over-impinge. A restraint that does not over-protect is likely not to over-impinge. But that is not always true. It depends on the particular circumstances. The interests of employer and employee are not identical. There is such a thing as undue harshness without over-protection. Employer's business may require restraints he is not entitled to impose. Courts carefully compare the consequences—to the employer, if the restraint is held bad—to the employee, if held good. Slight benefit to the employer at the expense of great harm to employee does not appeal to equity. Disproportionate hardship on the employee is generally fatal to the restraint. 6 Corbin on Contracts 521-522, Sec. 1394, 526, Sec. 1395; 5 Williston on Contracts 4581, Sec. 1636; 76 U. Pa. L. Rev. 244, 256; 26 Cornell L. Q. 707, 712, N. 16; 9 A. L. R. 1456, 1473, 1482-1483; 20 A. L. R. 861; 3 Detroit L. Rev. 38, 40-41, 43; 16 Notre Dame Law. 135, 136; 24 Notre Dame Law. 606, 607; Sternberg v. O'Brien, 48 N. J. Eq. 370, 373, 375; 2 Restatement, Contracts, p. 1001, Sec. 516, com. h; Herreshoff v. Boutineau, 17 R. I. 3, 7; Ridley v. Krout, 63 Wyo. 252, 265; Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 470; Granger v. Craven, 159 Minn. 296, 304; **Gates-McDonald Co. v. McQuilkin, 33 Abs 481, 483;** Paragon Oil Co. v. Familton, 5 N. P. 23, 25-26.

In treating undue harshness and oppression, the courts, in addition to considering what has already been mentioned, also, with widely varying degrees of effect on the ultimate result, focus a great deal of attention on such inquiries as: What is the situation of employee and his family? What is employee's capacity? Is employee handicapped or disabled in any way? What effect will the restraint have on employee's life? Will it deprive him of opportunity of supporting himself and his family in reasonable comfort? Will it tend strongly to impoverish him? Will it force him to give up the work for which he is best trained or be expatriated? What are business conditions? Is there prevailing unemployment? Was the employment terminable at employer's will? Did employee work for employer a very brief time? What were the circumstances of termination of the employment? Did the termination constitute a breach of contract by employer? If not a breach, was it unreasonable? What is the character and extent of consideration to employee? 6 Corbin on Contracts 515-516, 521-524, Sec. 1394, 526, Sec. 1395 (this is the

finest statement of law on this particular phase); 5 Williston on Contracts 4584, Sec. 1636, 4612, Sec. 1643, 4647, Sec. 1652; 5 Peabody L. Rev. 79, 90; 56 C. J. S. 441, Sec. 46; 24 Notre Dame Law. 606, 607; 9 O. Jur. 370-371, Sec. 151; 5 O. S. L. J. 263, 265-266, 267-268; 9 Temple L. Q. 454, 455; 18 Ia. L. Rev. 546, 547; 155 A. L. R. 652; 8 Ann. Cas. 155, 157; Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 469, 471, syl. 4; Menter Co. v. Brock, 147 Minn. 407, 411; Standard Oil Co. v. Bertelsen, 186 Minn. 483, 484-485, 487; Kadis v. Britt, 224 N. C. 154, 157, 160, 162-163, 164; Ridley v. Krout, 63 Wyo. 252, 267, 276-277; Orkin Exterminating Co. etc. v. Dewberry, 204 Ga. 794, 807-808; Parish v. Schwartz, 344 Ill. 563, 568, 570; 28 Am. Jur. (Injunctions) ·Sec. 108 (pocket supp.); 31 L. R. A. N. S. 249, 253-254; 9 A. L. R. 1456, 1478; 35 Am. Jur. 528, Sec. 99; 12 Am. Jur. 957-960, Secs. 381-382; Shreveport Laundries, Inc. v. Teagle, 139 S. (La. A.) 563, 565; Public Laundries, Inc. v. Taylor, 26 SW 2nd 1085; Economy Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 552-553; Smith Baking Co. v. Behrens, 125 Neb. 718, 721-722; Lawrence & Gilroy Dental Co. v. Gilroy, 50 Ill. A. 310; **Yost v. I. Fleischer & Sons, 49 Oh Ap 46** (mutual abandonment of contract); Roy v. Bolduc, 140 Me. 103, 107-108; Byers v. Trans-Pecos Abstract Co., 18 S. W. 2nd (T. C. A.) 1096, 1098; Lantieri Beauty Salon, Inc. v. Yale, 7 N. Y. S. 2nd 984, 986.

**Fourth.** Is the restraint reasonable in the sense that it is not injurious to the public? See authorities cited under statement of this question supra. If it is injurious to the public, generally it is held invalid. If a restraint is unduly harsh and oppressive on employee, generally it is injurious to the public. Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 474, syl. 7. Though the restraint is no greater than necessary to protect employer it may be injurious to public. 36 Am. Jur. 536, Sec. 55. Compare **Lufkin Rule Co. v. Fringeli, 57 Oh St 596, 607, syl. 2.** The restraint may not unduly oppress employee and yet it may be injurious to the public. 16 Notre Dame Law. 135, 136. The restraint may be injurious to the public though it is neither greater than necessary to protect the employer nor unduly harsh on employee. 5 Williston on Contracts 4581-4582, Sec. 1636; 31 Ia. L. Rev. 249, 254; 5 Peabody L. Rev. 79, 82; Tarr v. Stearman, 264 Ill. 110, syl. 4. Moreover, a restraint may be bad in all three respects—over-protecting employer—unduly oppressing employee—and injuring public. Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 469-470. As seen by examining the authorities referred to under this question "Fourth," the courts, in determining whether a restraint injures the public,

examine carefully such questions as: Does the restraint tend to deprive employee of a reasonable opportunity to make a living for himself and family? Is employee likely to become a public charge? Does the restraint interfere with the utilization of employee's skill, talent and continued productivity? Is there a shortage of employee's type of service in the restricted area? Does the restraint stifle competition, encourage monopoly? Does the restraint waste public money? Of course, since a restraint that unduly oppresses employees is also injurious to the public, the questions which are pertinent to former are also pertinent to latter.

**Fifth.** Are the unreasonable and invalid parts of the restraint severable? 5 Williston on Contracts 4581, Sec. 1636, 4679-4685, Secs. 1659-1660; 9 O. Jur. 380, Sec. 159; 6 Corbin on Contracts 524, Sec. 1394. Literally dozens of the above periodicals deal with this question.

**Sixth.** Did employee breach or threaten to breach this covenant? 6 Corbin on Contracts 522, Sec. 1394; 2 Page on Contracts 1394-1395, Sec. 791; 43 C. J. S. 576-577, Sec. 84; 28 Am. Jur. 295, Sec. 101; 36 Am. Jur. 549-551, Secs. 72-74; Sternberg v. O'Brien, 48 N. J. Eq. 370, 375; Mitchell v. National Window-Cleaning Co., 155 Ga. 215, 217-219, syl.

**Seventh.** Does employee's work for rival irreparably injure employer or threaten to injure him irreparably? If not, injunction is usually denied. This irreparable injury requirement is not peculiar to cases involving this peculiar type of negative covenant. Neither is it new. It's a standard standby—an old equitable custom applied to injunctions generally. 43 C. J. S. 427, Sec. 16, 431, Sec. 19, 446, Sec. 23, 885, Sec. 190; 28 Am. Jur. 242-243, Sec. 47, 217-218, Sec. 24, 277-278, Sec. 83, 458, Sec. 282, 470, Sec. 297; 21 O. Jur. 1077-1078, Sec. 65, 1144, Sec. 101; 16 O. Jur. 47-48, Sec. 18; 1 Lawrence on Equity Jur. 346, Sec. 293. It is equally requisite to the instant type of suit, and the burden of proof is on the employer. 21 O. Jur. 1133, Sec. 95; 35 Am. Jur. 528, Sec. 99; 28 Am. Jur. 302, Sec. 108; 43 C. J. S. 573, Sec. 84; 6 Corbin on Contracts 520, 522, Sec. 1394; 41 Harv. L. Rev. 782, 783; 17 Ind. L. J. 181, 182; 16 Minn. L. Rev. 316, 317; 17 Minn. L. Rev. 444, 445; 29 Ill. L. Rev. 530; 41 W. Va. L. Q. 285; 51 W. Va. L. Q. 131, 134; 3 Detroit L. Rev. 38, 41; 31 L. R. A. N. S. 249, 252; Sternberg v. O'Brien, 48 N. J. Eq. 370, 374, 375, 378; Menter Co. v. Brock, 147 Minn. 407, 409, 411, 412, syl.; Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 470; Murray v. Cooper, 51 N. Y. S. 2nd 935, 937.

Irreparable injury is difficult to define and the books are bent down with definitions. 16 O. Jur. 47-52, Sec. 18; 21

**42**

O. Jur. 1005, Sec. 16, 1078-1080, Sec. 65, 1081-1082, Sec. 68; 28 Am. Jur. 221-224, Secs. 29-30, 243-245, Sec. 48; 25 C. J. S. 458, Sec. 2; 43 C. J. S. 435-438, Sec. 21, 447-448, Sec. 23, 451, Sec. 25; Black's Law Dictionary (DeLuxe Ed.) 502, 966; 22 Words And Phrases (Perm. Ed.) 667- 676; 2 Lawrence on Equity Jur. 1180-1182, Secs. 1097-1098. Representative of Arthur Murray's cited definitions of irreparable injury is this one in 28 Am. Jur. 243-245, Sec. 48:

"Meaning of Term.—It is somewhat difficult to frame a general definition of irreparable injury that would be applicable to all the cases. The term has acquired in the law of injunctions a meaning which, perhaps, is not quite in keeping with its derivation or its literal signification, and has been often defined by the courts in varying language. The question whether the complainant will in fact suffer an irreparable injury in the sense here intended must depend for its solution largely upon the character of the act or acts alleged to be injurious. There are many injuries incapable of being repaired which a court of equity does not regard as irreparable—injuries, for example, that in the very nature of things cannot be remedied by any money consideration. Of such character are those resulting from acts which outrage the feelings or cause the loss of things of a sentimental value. On the other hand, there are injuries which in their nature may be repaired, but will be treated as irreparable if the person inflicting or threatening them is insolvent or unable to respond in damages. As ordinarily understood, an injury is irreparable, within the law of injunctions, where it is of such a character that a fair and reasonable redress may not be had in a court of law, so that to refuse the injunction would be a denial of justice; where, in other words, from the nature of the act, or from the circumstances surrounding the person injured, or from the financial condition of the person committing it, it cannot be readily, adequately, and completely compensated for with money. To be irreparable, the injury need not be beyond the possibility of repair or beyond possible compensation in damages, nor need it be very great. The term 'irreparable damage' does not have reference to the amount of damage caused, but rather to the difficulty of measuring the amount of damages inflicted. Where, however, there is a full, complete, and adequate remedy in a court of law, for an injury, it is not irreparable; and if full compensation can be obtained by damages in an action in that form, equity will not apply the extraordinary remedy by injunction.

"An injury will be regarded as irreparable so as to warrant

injunctive relief where it tends toward the destruction of the complainant's estate, or where it is of such a character as to work the destruction of the property as it has been held and enjoyed, so that no judgment at law can restore it to him in that character. Very often an injury is irreparable where it is continuous and repeated, although it would not be if it were temporary, since from its constant and frequent recurrence, no fair and reasonable redress can be had therefor in a legal action, or where it is remediable at law only by a multiplicity of suits, or where the damages occasioned are estimable only by conjecture, and not by any accurate standard."

We are willing to accept this definition as far as it goes, but it doesn't go far enough. It omits a number of important qualities that are necessary to qualify the thing under discussion as the type of thing that unlocks injunctive relief. First there must be injury, either actual or threatening. It must be real, not imaginary and not doubtful. There can be no irreparable injury without injury. There can be no adjective modifying a noun if there is no noun. Second, conceding that an irreparable injury is something difficult to measure, usually there must be something more than just fear of injury, and something more than trivial or inconsequential injury. In 43 C. J. S. 439-440, Sec. 22, it says:

"Usually a complainant is not entitled to an injunction where he can show no injury to himself from the action sought to be prevented, and ordinarily, in order to entitle a person to injunctive relief, whether prohibitory or mandatory in its nature, he must establish as against defendant an actual and substantial injury or an affirmative prospect thereof. This is true whether the injury is single or continuous, and especially is this true where in addition the writ would operate oppressively or contrary to true justice. Thus an injunction will not be granted where the damage is so small and the right so unimportant as to make the case a trivial one, or is technical and inconsequential, or fanciful and sentimental, or a mere inconvenience, or is merely nominal, theoretical, or speculative, even though an action at law might be maintained for the same injury."

In 43 C. J. S. 435-438, Sec. 21, it says:

"While an injunction will be granted if irreparable injury is threatened and impending to the rights of complainant, injunction will not issue to allay the mere fears and apprehensions of individuals. If irreparable injury is threatened and impending to rights of a complainant, an injunction usually will be granted, as it is not necessary to wait for

the actual occurrence of an injury which it is shown may be reasonably expected * * *.

"Injunction will not issue in the absence of an actual or presently threatened interference: It is not sufficient ground for an injunction that the injurious acts may possibly be committed or that injury may possibly result from the acts sought to be prevented; but there must be at least a reasonable probability that the injury will be done if no injunction is granted, and not a mere fear or apprehension since injunctions will not be granted merely to allay the fears and apprehensions of individuals, which, it has been said, may exist without substantial reasons and be absolutely groundless."

In **21 O. Jur. 1075-1076, Sec. 64,** it says:

"To authorize interference by injunction the injury must be real, certain, substantial, and serious. Equity will not enjoin if the injury be doubtful, trifling, inconsiderable, merely nominal, or technical."

Same: 28 Am. Jur. 220-224, Secs. 28-30; 2 Lawrence on Equity Jur. 1181, Sec. 1097; **21 O. Jur. 1005, Sec. 16, 1081-1082, Sec. 68.**

Mere difficulty in proving injury standing alone does not automatically mean irreparable injury. It does not even mean that there is injury. One must distinguish between something that is difficult to measure only because it is non-existent and something that is difficult to measure though existent.

Remembering that the burden is on Arthur Murray to prove irreparable injury, where is the proof? Certainly there is not one microscopic bit of evidence of actual injury. It is not shown that Arthur Murray lost one pupil or one penny. To the contrary, in Worrie v. Boze, 191 Va. 916, 928, syl. 9, 10, (an Arthur Murray teacher case) and in **Briggs v. Butler, 140 Oh St 499, 504,** there is actual irreparable injury; the ex-employee was starting to cut his ex-employer's business into ribbons, soliciting and taking away customers that the ex-employee had served for the ex-employer. That evidence was enough to satisfy the requirement of irreparable injury. It wasn't necessary to translate that deflection into dollar and cents damages. That would have been difficult to measure and therefore the injury was irreparable.

We are asked to substitute presumption for proof. We are asked to presume irreparable injury using as precedent an analogy from a different situation. The great weight of authority holds that if an owner of an established business sells it and enters into a reasonable covenant not to compete with the buyer, irreparable injury will be presumed from the

mere violation of the covenant. 43 C. J. S. 566, Sec. 84; **Brass & Iron Works Co. v. Payne, 50 Oh St 115, 118.** In Eureka Laundry Co. v. Long, 146 Wis. 205, 208-210, a leading case relied upon by Arthur Murray, it was held that negative covenants in sale contracts and negative covenants in employee contracts should be treated alike. However, the wings of the Eureka Laundry case were considerably clipped in the later Wisconsin case of Milwaukee Linen Supply Co. v. Ring, 210 Wis. 467, 473, which recognizes a distinction between the two situations. Moreover, the snow-balling weight of authority in England and the United States recognizes a distinction. In contrasting the employee covenant with the sale covenant, some of the typical pronouncements are—the employee covenant is more critically examined, more strictly construed—it is construed favorably to the employee—it is viewed with askance and more jealously—it is not viewed as liberally or with the same indulgence—it is looked upon with less favor, more disfavor—courts are more loathe, less disposed and more reluctant to sustain or enforce it— not identical tests but different considerations apply—there is more freedom of contract between seller and buyer than between employer and employee,—the latitude of permissible restraint is more limited between employer and employee, greater between seller and buyer. The following are some of the reasons given for making the above distinction. The average, individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate restrictive covenants placed before him to sign. To him, the right to work and support his family is the most important right he possesses. His individual bargaining power is seldom equal to that of his employer. Moreover, an employee ordinarily is not on the same plane with the seller of an established business. He is mort apt than the seller to be coerced into an oppressive agreement. Under pressure of need and with little opportunity for choice, he is more likely than the seller to make a rash, improvident promise that, for the sake of present gain, may tend to impair his power to earn a living, impoverish him, render him a public charge or deprive the community of his skill and training. The seller has the proceeds of sale on which to live during his period of readjustment. A seller is usually paid an increased price for agreeing to a period of abstention. The abstention is a part of the thing sold and is often absolutely necessary in order to secure to the buyer the things he has bought. Usually the employee gets no increased compensation for agreeing to

the abstention; it is usually based on no other consideration than the employment itself.

The authorities supporting the statements in the preceding paragraph are: 5 Williston on Contracts, 4606-4607, Sec. 1643; 6 Corbin on Contracts 523, N. 86, 526-527; 2 Restatement, Contracts, p. 989, Sec. 515, com. b.; 17 C. J. S. 637, Sec. 254; 6 R. C. L. 793-794, Sec. 197; Clark on Contracts 430; Benjamin on Sale 541-542; Chitty on Contracts 484; Leake on Contracts 558; 40 L. R. A. N. S. 473; 24 L. R. A. N. S. 933, 934; 76 U. Pa. L. Rev. 244, 267-269; 82 U. Pa. L. Rev. 872, 874, N. 12; 41 Harv. L. Rev. 782, 784; 8 N. C. L. Rev. 90, 92; 9 N. C. L. Rev. 227, 228-229, 231; 22 Cornell L. Rev. 246, 248; 18 Ia. L. Rev. 546, 547; 24 Notre Dame Law. 606, 607; 21 Colum. L. Rev. 599, 600; 28 Colum. L. Rev. 81, 83, N. 18; 32 Colum. L. Rev. 291, 294, N. 13; 32 Marq. L. Rev. 282; 51 W. Va. L. Q. 131, 134; 9 Wis. L. Rev. 309, 310; 3 Detroit L. Rev. 38-40; 16 Minn. L. Rev. 316; 22 Minn. L. Rev. 273, 274; 11 Ind. L. J. 181, 182-183; 173 L. T. 392; 55 Scot. L. Rev. 108; 81 Sol. J. 726, 727. Orkin Exterminating Co. etc. v. Dewberry, 204 Ga. 794, 803-804; Kadis v. Britt, 224 N. C. 154, 160; Samuel Stores, Inc. v. Abrams, 94 Conn. 248, 252-253, syl. 2; Allen Mfg. Co. v. Murphy, 23 Ont. L. Rep. 467, 473, syl. 3; Kaumagraph Co. v. Stampagraph Co., Inc., 188 N. Y. S. 678, 685, aff. 235 N. Y. 1; Schmidl v. Central Laundry & Supply Co., Inc., 13 N. Y. S. 2nd 817, 823, syl. 7; Byers v. Trans-Pecos Abstract Co., 18 S. W. 2nd (T. C. A.) 1096, 1098-1099; Osius v. Hinchman, 150 Mich. 603, 608.

This distinction was intimated in Nordenfelt v. Nordenfelt, (1894) A. C. 535, and definitely laid down in Mason v. Provident etc. Co. Ltd. (1913) A. C. 724, and in Morris, Ltd. v. Saxelby (1916) 114 L. T. R. 618. See 21 Colum. L. Rev. 599, 600. It had a slow start in the United States due undoubtedly to the opposition of the distinguished, Professor Samuel Williston. 5 O. S. U. L. J. 263, 265-266. Though he could slow it, he could not stop it. It moved like a glacier. In the 1920 edition of his work on Contracts, Professor Williston referred to this distinction as "unadvisable as a positive rule of law." Vol. 3, p. 2892, Sec. 1643. In this 1937 edition, though he re-iterates that statement, he admits "There is a tendency in the United States to follow the English courts in differentiating between contracts in restraint of trade and contracts in restraint of employment." Vol. 5, p. 4607, Sec. 1643.

The weight of authority carries this distinction into irreparable injury. In the employee covenant case, as distinguished from the sale covenant case, it is not presumed. Irreparable injury, actual or threatening, must be proved.

17 Minn. L. Rev. 444-445; 51 W. Va. L. Q. 131, 134; 11 Ind. L. J. 181, 182; 43 C. J. S. 573, Sec. 84. As said in Menter Co. v. Brock, 147 Minn. 407, 410, "breach of a like covenant in an employment contract does not so readily indicate irreparable injury to the employer." Heflebower v. Sand, 71 F. Supp. 607. Thinking this distinction soundly equitable, we are not disposed to let Arthur Murray thumb a free ride on a presumption.

If there is no actual or presumed irreparable injury here, where is the threatened irreparable injury? Arthur Murray seeks to establish it on three grounds.

The first ground is the so-called "customer contact" theory. This is that the employee, by contact with the customer, gets the customer so strongly attached to him that when the employee quits and joins a rival he automatically carries the customer with him in his pocket. The best exposition of this theory is found in 5 Peabody L. Rev. 79, 82-84 (a periodical from Portland, Maine, that seems to have been published only in five volumes and then died).

This is a much-abused, much-misunderstood and much-misapplied theory.

Mere customer contact and nothing more doesn't always bring the customer so completely under the employee's spell that the customer will automatically move with the employee wherever the employee goes.

Take the elevator operator. Who more regularly and frequently contacts his employer's customers? Yet who ever heard of a tenant moving from the Union Commerce Building to the Terminal Tower or Caxton Building because an elevator operator did? Suppose you are the kind of client who has to see your lawyer every day and you see and chat with his receptionist every day. When she switches to another law office do you switch too? Take Bill, the bill collector. He may have collected regularly from Mrs. Jones for years. Now he goes to work for a rival agency. Will Mrs. Jones switch to the merchants who use the rival so that Bill can continue coming to her door? The absurdity of blindly following unthinking generality in applying the "customer contact" theory was best exposed in the bill collector case of Sternberg v. O'Brien, 48 N. J. Eq. 370, 377, where the court discerningly said:

"His intercourse with them was of a kind which was much more likely to excite dislike and create antagonism than to inspire confidence or to give him popularity."

Finally take the caretaker of an apartment. You are the tenant. You have contact with him daily. You like him.

He is practically his employer's sole contact with you. He changes to another apartment. Do you?

Assuredly, the customer contact theory has its place, but it should be put in its place and kept in its place. Just to shout "customer contact" does not justify an injunction. All customer contacts are not contagious any more than are all ailments. You wouldn't want to dance with a partner who had smallpox or scarlet fever but you wouldn't worry if it were merely high blood pressure or arthritis. One of the oft-quoted citations on the customer contact and irreparable injury is this from 52 A. L. R. 1362, 1363:

"The nature of his business, and the connection of the employee therewith, must be such as to induce the belief that irreparable damage would result to the employer from the employee's breach of the restrictive covenant. * * *. These facts are generally established by evidence that the employer's business depends largely upon the efforts of employees acting for it in the capacity in which the defendant acted; and that the **personal relations** established between such employee and the employer's customer, by coming into personal contact, are **such as to enable the employee to control,** in whole or in part, the business of such customers **as a personal asset.**"

See also Menter Co. v. Brock, 147 Minn. 407, 410. The important thing is that the personal relation between the employee and customer be such as to enable the employee to control the customer's business as a personal asset. The point is clearly emphasized in Lantieri Beauty Salon, Inc. v. Yale, 7 N. Y. S. 2nd 984, 986, wherein the court distinguishes that case from another case brought by the same employer:

"The facts in this case differ materially from those in Lantieri Beauty Salon, Inc., v. Perrone. There the employee was a skilled operator—a hairdresser and haircutter—who voluntarily left plaintiff's employ and went to work for another beauty parlor one block from that of his former employer. It also appeared that the defendant in the Perrone Case had built up a considerable personal following during his employment by the plaintiff, and that some of these customers refused to patronize the plaintiff after defendant left but were served instead by the defendant at his new place of employment. These facts distinguish the Perrone Case from the present action."

**Racine v. Bender,** 141 Wash. 606, 608-609, where injunction was granted, involved an accountant, but the **evidence showed** that the employer had:

"spent some seventeen years in building up this business and that he employs a number of men to do the actual work at clients' places of business; that, as work is to be done he sends an accountant to do the work, but as the client learns to know the accountant the desire of the client to have the particular accountant do his work increases to the point where it is almost impossible to change the accountant, owing to the confidential knowledge he has of all the important and vital matters concerning the business; that * * * the accountant in most cases is the only point of contact between the appellant (employer) and the client (and) * * * that at least twenty-two of appellant's former clients changed to respondent when he commenced business for himself, and that substantial damage has resulted to appellant."

Now why can't the elevator operator and the apartment caretaker automatically take the tenant with him? There are two main reasons, for which we would like to coin the phrases **"employer's hold"** (or "institutional hold") and **"customer inconvenience."** A customer may like an employee, but how far he is willing to inconvenience himself and suffer because he likes him is a different matter. Because he likes the elevator operator, will he break his lease and incur damages? Will he endure the trouble of packing, moving, re-establishing? And the expense? Will he sacrifice the advantage of customers being accustomed to do business with him at his present stand? Will he leave an advantageous location he likes and follow to a disadvantageous one he dislikes? How far will he follow? Two buildings away? Two miles away?

If two teachers exchange colleges, do their students automatically exchange colleges? If the deans of the Harvard and Yale law schools exchanged chairs it might be very unflattering to see how few, if any, of their students would try to follow them. As every school knows there is such a thing as an "institutional hold" that may be greater than the hold of one teacher, such as the hold it exercises through such things as loyalty, tradition, reputation, the campus, classmates, friends, fraternity brothers, other teachers and the girl who wears one's fraternity pin. In 35 Ky. L. J. 261, 273, it says:

"* * * where customers call at the premises of the employer

and the employer has the opportunity to become personally acquainted with these customers himself or to become acquainted with them through his other employees and to hold their interest and their patronage through the exercise of his own personality and fair dealing or through the personality and fair dealing of his other employees generally, he is at no disadvantage as compared with an employee who has had contact with the customers and then leaves and seeks to obtain their patronage."

Having in mind that the employer is trying to show that the customer will automatically follow the employee, he can't escape a consideration of these questions:

1. How powerful a hold did the employee get on the customer? There are strong magnets and weak ones. Some can lift only a small coin. Some can lift tons.

2. How difficult is the particular customer to move? What are the employer's holds? What are the customer inconveniences? A magnet must be considered in the light of the load to be lifted.

3. How far does the employee have to move the customer?

4. Does this employee have a powerful enough hold to pick this customer up and move him that far?

The situation in which the customer contact theory is most frequently applied is the route cases involving milk and laundry men. They constitute a very specialized situation— entirely different from the instant one as we shall later see.

Why did Arthur Murray establish a studio on the Heights in addition to one downtown? Could it have been more easily to attract a neighborhood clientele that might not so readily take the trouble to go downtown? Could it have been for customer convenience? If customer response to convenience is a vital factor, did Witter get such a hold on the tired business executive and his wife while teaching them in Arthur Murray's Heights Studio that they will automatically discard that convenience and for him gladly take on the burden of a night time drive through metropolitan traffic to a downtown parking problem just to sit at Witter's feet in Fred Astaire's downtown studio seven miles distant?

Assuming that you might follow a waiter, barber or grocer a few doors or a few blocks, isn't there a limit to the distance and inconvenience you will go to follow him? You may like your milkman. You may like him so well that if he changes employers you will follow him. But if he moves across town to a route five miles away and if, instead of his bringing the

milk to your door, you have to jump in your car and travel through five miles of traffic-infested streets to get the milk from him, are you going to do that, especially if another smiling representative of your old dairy stands ready to deliver milk at the handier doorstep where you are used to receiving it?

There are these obvious differences between the route milkman and Clifford Witter:

1. By common experience we know the nature of a milkman's operations and how and what kind of a hold he gets on customers. By common experience we do not know the same about Witter. The burden of proof is on Arthur Murray. As we indicated in the statement of facts, the record is full of blind spots about Witter's operation. The record is more conspicuous by what it omits than by what it includes on this question. The evidence does not establish that Witter in his approximate year at Arthur Murray's (mostly part-time) got any hold on or had any following among Arthur Murray's patrons.

2. When the milkman changes employers and the customer follows him, there is no customer inconvenience. The customer continues to find the bottle at his door. The patron who would follow Witter must now drive downtown to another studio seven miles away.

3. The milkman comes to the customer's door. The dance pupil comes to Arthur Murray's hospitable and attractive studio which may easily get a hold on him.

4. The milkman is usually his employer's sole representative that contacts the customer. Witter was not. Arthur Murray had contacts with the customer through his sales staff, his analyst, the desk and other teachers. It is just as easy to believe that they had a hold that would keep the customers, as it is that Witter had a hold that would take them away. In the absence of any evidential light, who can say? The burden of proof is on Arthur Murray.

5. If Arthur Murray has classes or parties as many studios do (the evidence is silent either way) a patron may easily become attached to Arthur Murray through friendships made at and clustering about his studio. The milkman's employer can offer nothing comparable.

6. An Arthur Murray patron may well be tied up contractually to Arthur Murray for a series of lessons. If they are paid for, he may not like Witter well enough to kick the pre-paid lessons out the window. If they are not pre-paid, he may not wish to put Arthur Murray to the trouble of

bringing suit. On the other hand, a dairy's customers are usually not tied up contractually to a series of deliveries; and may quit without any penalty on a moment's notice.

7. Just as one has to consider the difference between tossing a tiger or a pet cat into a cage with a human being, so here, in determining whether an ex-employee is a threatening menace, one has to consider the very nature of the actor. A milkman is usually a customer-procuring, business-getting type. That's his purpose and design. Inherently he becomes a highly dangerous deflector of business. In **Briggs v. Butler, 140 Oh St 499, 506,** consider how the customer-procuring, business-getting ex-employee was beginning to tear the roof off the very house she had built for employer. A milkman, being the type he is, turn him loose on behalf of a rival in the small area where he's been operating and you know what's going to happen. That's why some of the cases say that the employer may enjoin the ex-employee from working along his old route just as soon as the ex-employee starts working there for a rival, and that the employer does not have to wait until the ex-employee starts picking off his old customers. He doesn't have to wait for the inevitable. Irreparable injury is impending and threatening. By sharp contrast, Witter is not in the customer-procuring business. He's the plant worker type. Arthur Murray was not able to show that Witter had approached, solicited or deflected one Arthur Murray pupil, or that he had such a hold that one pupil on the pupil's own initiative, followed Witter. Twice Witter was on the stand and Arthur Murray did not even cross-examine him about it. If Witter had been such a magnet the best proof would have been to show that he was actually attracting away his old pupils. If he had been doing that, surely Arthur Murray would have been just as resourceful to detect and prove it as countless other litigious employers. Unlike the milkman working his old route for a rival, Witter has not been out among the haunts of his old pupils. The two are too frequent to be just coincidental— i. e.—the finding of definite proof of the ex-employee soliciting and deflecting his old customers in cases where injunctions are granted relying on "customer hold"—such as **Briggs v. Butler, 140 Oh St 499, 506** and Worrie v. Boze, 191 Va. 917, 928 (An Arthur Murray Case). If Witter were pursuing a studied plan of soliciting and deflecting his old pupils this would be a different case.

8. On the area factor the route case is not comparable to this case. If you had a big map of Cuyahoga County (which is roughly the area from which it is sought to exclude Witter)

the average milk route on it would look like a fly speck on a department store's plate glass window. Contrasting the threat of the milkman in his little route with the threat of Witter (not a customer procurer) in Cuyahoga County, isn't it obvious that a milkman's influence is concentrated while Witter's is so diluted as to be of doubtful existence? Dropping a spoonful of arsenic into a half tumbler of water and dropping a spoonful of lemonade into Lake Erie is about the same difference. There are seventeen different states that individually have fewer people than our great metropolitan county with its fifty thousand more than 1-1/3 million people. Suppose Witter serviced a few hundred of those for Arthur Murray? Is Witter such a threat to keeping those few in the Arthur Murray fold that he must now be denied access to more than 1-1/3 million people?

On the record in this case, we find no such customer hold as to prove threatened irreparable injury.

Next Arthur Murray seeks to establish threatened irreparable injury on the "**business or trade secret theory.**" This theory is that the employer has some secrets (business or trade) which are essential to his business; that, in the course of employment, he disclosed them to employee in confidence; that the secrets are of such character that if disclosed to a rival they would seriously prejudice employer; and that if employee is allowed to work for rival there would be imminent, real danger of those secrets being disclosed to and confiscated by rival. In addition to authorities cited under sub-questions 26, 27 and 28 under question "Second," supra, see Ideal Laundry Company v. Gugliemone, 107 N. J. Eq. 108; H. B. Wiggins Sons' Company v. Cott-A-Lap Company, 169 F. 150; 133 'A. S. R. 759, 765, (mere suspicion and opportunity to disclose held not sufficient); 6 John Marshall L. Q. 491, 500; 2 Callmann on Law of Unfair Competition and Trade-Marks 869-870, Sec. 59.1.

You can't have vanilla ice cream without having ice cream. You can't have business or trade secrets without secrets. You don't make the multiplication tables a secret merely by calling them a secret. To be a secret in the sense necessary here to obtain equitable relief, it must be known only to the particular employer and those of his employees to whom it is necessary to confide it in order to use it for what it is intended. It is something known only to one or a few and kept from others. The question is not whether it is not known to the general public. It must be a secret of the particular employer and not a general secret of the trade. **39 O. Jur. 433,** Sec. 1; 56 C. J. S. 484, Sec. 72; 133 A. S. R.

753, 760, 764; 63 C. J. 239-240; 36 Am. Jur. 584-585, Sec. 108; 43 C. J. S. 750-752, Sec. 148. Kaumagraph Co. v. Stampagraph Co., 235 N. Y. 1, 7; Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 85.

There is no presumption that a thing is a secret. The burden is on Arthur Murray to prove that it is a secret. 43 C. J. S. 752, Sec. 148; 2 Callmann on Law of Unfair Competition and Trade-Marks, 806, Sec. 53.3, 869, Sec. 59.1; 1 Nims on Law of Unfair Competition And Trade-Marks 420, Sec. 149; 6 John Marshall L. Q. 491, 500; 21 Colum. L. Rev. 599, 600; Gates-McDonald Co. v. McQuilkin, 33 Abs 481, 482-483; Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, Syl. 4; Kaumagraph Co. v. Stampagraph Co., 235 N. Y. 1, 10; Kadis v. Britt, 224 N. C. 154, 161-162; Heflebower v. Sand, 71 F. Supp. 607, syl. 4; Molina v. Barany, 56 N. Y. S. 2nd 124, 133, syl. 18; Byers v. Trans-Pecos Abstract Co., 18 S. W. 2nd 1096, 1098, syl. 5.

The trouble here is that Arthur Murray has proved no secret. The essence of his proof on this point is merely "I taught Clifford Witter my method of teaching." How does that prove secrecy? All of us have "our method" of doing a million things—our method of combing our hair, shining our shoes, mowing our lawn. Labelling it "my method" does not make it secret.

This is the perfect example of proof not living up to highsounding, "Whereas" clauses or petitions. The Massachusetts court aptly exposed a similar situation in Club Aluminum Co. v. Young, 263 Mass. 223, 227-228. Our own Court of Appeals cited that case with approval in Gates-McDonald Co. v. McQuilkin, 33 Abs 481, 482-483 where is said:

"The defendant entered plaintiff's employ as a salesman under a contract which provided that for one year after its termination he would 'not engage in the sale of aluminum cooking utensils by a similar plan' to that used by the plaintiff in certain States. The bill sought to enjoin the defendant from remaining in the employ of a competitor, contrary to the terms of the contract. The court held that the plaintiff failed to prove that the training given by the plaintiff to the employee, 'was based upon secrets possessed by the plaintiff to the exclusion of others and therefore did not show a wrongful use by the defendant of knowledge of trade or business secrets of the plaintiff.'"

The Massachusetts Court further said (227-228)

"The plan described in the bill was not used by the plaintiff alone. It was not hidden from others. It was openly practiced both by the plaintiff and at least three of its com-

petitors in business. There are no allegations to the effect that the training given by the plaintiff to Young was based upon secrets possessed by the plaintiff to the exclusion of others. 'Highly specialized training and personal supervision' in connection with the sales of ordinary merchandise well known in the market, alleged to have been given by the plaintiff to all its salesmen, are statements too general in nature to constitute ground for legal relief. The specifications of the bill go no further than similar indefinite and magniloquent descriptions. Boston v. Treasurer & Receiver General, 237 Mass. 403, 415. The averments of the bill in the main describe such supervision and instruction of salesmen as manufacturers exercising business sagacity in the plaintiff's line of business well might use in substance, if not in detail. They constitute the usual solicitude and effort to promote sales and to make the business successful. * * * It is difficult to conceive of any ordinary employment which could not be cleverly clothed in broad language as special and peculiar as that employed in the contract here in issue."

In Menter Co. v. Brock, 147 Minn. 407, 409, it says:

"While some witnesses for plaintiff referred in general terms to trade secrets and special methods of doing business possessed by plaintiff, when required to name any in particular they failed utterly, or else pointed out methods known and practiced generally in carrying on business like plaintiff's."

In Super Maid Cook-Ware Corp. v. Hamil, 50 F. 2nd 830, 832, the court bemoaned the fact that the petition's general allegations as to secrets were not borne out by the facts. See also Roy v. Bolduc, 140 Me. 103, 105-108; Ridley v. Krout, 63 Wyo. 252, 269-272 (business method nothing out of ordinary); Orkin Exterminating Co. Inc. etc. v. Dewberry, 204 Ga. 794, 799; Simms v. Burnette, 55 Fla. 702, syl. 3; Byers v. Trans-Pecos Abstract Co., 18 S. W. 2nd 1096, 1098 (no proof that used other than ordinary methods). In self-serving "Whereas" clauses an employer cannot state that he is going to confide something unique and hush-hush, and then merely disclose the A B Cs or Mother Goose Rhymes, and make that the basis of irreparable injury. Our case is definitely not one in which the enterprise was of unusual nature and the employee had full knowledge of employer's business and operation methods as in **Briggs v. Butler, 140 Oh St 499, 506, 510.** Any Clevelander who reads daily papers, glances occasionally into second story windows on a Euclid Avenue trolley ride or now and then looks into the telephone book's classified quarters knows that dancing schools are not a rare commodity.

The "secrets" issue was decided adversely to Arthur Murray

in a similar suit against an ex-teacher in 1949 in this very court (memo opinion by Blythin, J.). Arthur Murray Dance Studios of Cleveland, Inc. v. Longo, No. 604,246; affirmed, Court of Appeals No. 21,638; motion to certify denied, Supreme Court No. 32,126 (1950). There, Arthur Murray made a strenuous effort to prove secrets, even introducing his manuals. Judge Blythin wrote:

"Having perused the so-called Manuals and having heard the evidence the court is unable to discover trade or other secrets, confidences or other rights entitled to the protection of a court of equity."

Why Arthur Murray did not introduce his manuals or make any real attempt to prove secrets in the instant case is hard to understand unless perhaps it is that there are about two hundred Arthur Murray studios in the United States with hundreds of instructors and ex-instructors (3 quit the Heights studio within a month) and that there is still some truth in what one of the world's wisest men said some three hundred and fifty years ago—"Two may keep counsel, putting one away." Romeo and Juliet, Act II, Scene IV. Moreover, it is said in 43 C. J. S. 884, Sec. 190:

"* * * it will be presumed that all facts which are not fully and candidly disclosed by the party seeking an injunction are detrimental to him."

(Other dance instructor cases are Murray v. Cooper, 51 N. Y. S. 2nd 935, affirmed 294 N. Y. 658; Chadwick v. Dolinoff, 207 Ga. 702; and Worrie v. Boze, 191 Va. 916, 928. None, except the latter granted an injunction; and it is readily distinguishable on the ground that irreparable injury was shown by the employee's soliciting and deflecting his old customers.)

There is no proof of Arthur Murray having any secrets let alone making any disclosure of them to Witter. On the record in this case we find no such disclosure of secrets by Arthur Murray to Witter as to prove threatened irreparable injury.

Finally, Arthur Murray seeks to establish threatened irreparable injury on the "multiplicity of suits theory." Arthur Murray argues:

"The injuries themselves are continuing ones and * * * even if they could be shown in dollars and cents, would involve a multiplicity of suits which constitutes another reason for equity's intervention. * * * Day by day the plaintiff is being damaged by the defendant's use, for example, of its dancing instruction. Everyday the defendant uses another little method he learned from plaintiff. If the plaintiff were to bring a separate action for every one of these violations

and other similar violations of this contract then there would be virtually no end to the litigation * * *"

We disagree. The evidence shows no continuing injury, no actual injury and no threatened injury either through customer hold or imperiling of trade secrets. Witter is not teaching Arthur Murray's pupils, he's teaching Fred Astaire's pupils. Witter has established no competitive business. The real competitor is the established Fred Astaire. In teaching Fred Astaire's pupils, how can Witter injure Arthur Murray merely by using a "little method" he learned from Arthur Murray? Suppose Arthur Murray had taught Witter the A. B. C.s and Witter now uses them in Fred Astaire's service? Arthur Murray shows no secret in that "little method." Where did Arthur Murray learn that "little method"? From Fred Astaire? Is there any field—law, surgery or even dancing—where one man has originated or alone succeeded to all the good ideas and techniques, has kept them secret, and uses only them? To be realistic, suppose this court would enjoin Witter from working for Fred Astaire, how would Arthur Murray benefit? Will Fred Astaire fold up? Hardly! Tomorrow Fred Astaire will hire another instructor to take Witter's place teaching Fred Astaire's pupils. And that new teacher doubtless will use the same methods that Witter is using today which, so far as this court knows, are just the best methods used by the best dancing teachers today. If by any long odds, any threatened irreparable injury could come to Arthur Murray through multiplicity, it would be too trivial and doubtful to activate equity. See 43 C. J. S. 439-440, Sec. 22 (quoted supra, p. 43).

Looking back over a long road and remembering that every case must be decided on its own peculiar facts, that the covenant is not judged standing alone but in relation to the contract and to the particular situation in which it is sought to be enforced, that the burden of proof is on Arthur Murray, and that the right to an injunction must be clear and not doubtful, the court, on this record and in the exercise of its discretion, denies an injunction on two equitable grounds:—

1. To enjoin Witter from working for Fred Astaire would give Arthur Murray a protection he does not need under these particular circumstances.

2. Arthur Murray has proved no irreparable injury, actual or threatened.

In the event that Arthur Murray had established the prerequisites to equitable relief, the court would have been confronted with the question of what kind of an injunction to issue. The remedy must always be one that is fit and appro-

priate under all the circumstances. Would it have been sufficient merely to enjoin the disclosure of secrets or the solicitation of old customers? Or would it have been necessary to enjoin Witter from working for Fred Astaire? See authorities cited under sub-question 38 of question "Second," supra. Not having arrived at the question of remedy, we express no opinion on that question. A decree may be drawn accordingly.