**Bruce R. MARTIN, Appellant,**

v.

**CREDIT PROTECTION ASSOCIATION, Appellee.**

No. 05-87-00039-CV.

Court of Appeals of Texas, Dallas.

Jan. 19, 1988.

Rehearing Denied March 17, 1988.

Reversed July 13, 1988.

James L. Hicks, Jr., Dallas, for appellant.

Edwin Tobolowsky, Robert A. Miller, Dallas, for appellee.

Before ENOCH, C.J., and CARVER [1] and SCALES [2], JJ.

CARVER, Justice (Retired).

Bruce R. Martin appeals from a final judgment rendered by the trial court, without a jury, enjoining Martin for a period of three years from selling, soliciting, or contacting the customers of Credit Protection Association, Inc. which Martin theretofore had sold, solicited, or contacted as an employee and executive of CPA from 1980 through 1985, enforcing by such judgment a written agreement of Martin's given in consideration of his employment, or continued employment, by CPA. Finding no reversible error in the record, we affirm the judgment of the trial court.

The trial court filed its Findings of Fact and Conclusions of Law as follows:

## FINDINGS OF FACT

1. Plaintiff Credit Protection Association, Inc. ("CPA") is a Texas Corporation with offices in Dallas County, Texas. Nathan Levine is the President and Director. CPA is wholly owned by Etan Industries which is owned by Nathan and Ann Levine.

2. Defendant Bruce Robert Martin ("Martin") is a resident of Dallas County, Texas.

3. CPA is engaged in a collection service, primarily for cable systems accounts nationwide.

4. Martin was hired by Plaintiff in 1980 as Director of Marketing. In 1983, he was made a Vice President. On April 25, 1983, Martin executed an Employment Agreement, Plaintiff's Exhibit No. 2.

5. Martin signed the agreement. However, no representative of CPA ever signed the agreement.

6. If Martin had not signed the agreement, his employment would have been terminated.

7. The parties intended the agreement to be binding between them.

8. The agreement was ancillary to employment.

9. Plaintiff's collection process is not a trade secret or confidential information.

10. There is no evidence that CPA possesses any trade secrets.

11. On September 5, 1985, Martin decided to terminate his employment and on September 6, 1985, Martin terminated his employment with CPA effective immediately.

12. Within a few days after September 6, 1985, Martin, Stockton and Art Schulman agreed to start a business in competition with Plaintiff, CPA.

13. In October, 1985, Stockton and Martin began soliciting cable t.v. systems including customers of CPA.

14. In early November, 1985, Martin made a presentation to a multiple systems operator (MSO), Sammons Communications, soliciting business from individual cable systems of Sammons. Shortly thereafter, individual directions [sic] of operations for Sammons separately commited [sic] to permit Martin to serve 5 systems on a trial basis.

15. Prior to such commitment to Martin, CPA serviced all of Sammons' systems.

16. The 1200 checked accounts on Plaintiff's Exhibit No. 12 represent the accounts Martin sold, visited, solicited or learned of either directly or through his subordinates while employed by CPA.

17. CPA failed to reimburse Martin for expenses incurred by him in an amount of $2,032.75.

## CONCLUSIONS OF LAW

1. Plaintiff has not met its burden of identifying a trade secret of such impor-

---

1. The Honorable Spencer Carver, Justice, retired, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

2. The Honorable R.T. Scales, Justice, retired, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

tance as to permit enforcement of a contractual or noncontractual [sic] restriction against Defendant.

2. Plaintiff has established that the customer information identified by Plaintiff's Exhibit 12 is a sufficiently important interest to justify reasonable restrictions on the Defendant.

3. A period of 3 years from the date of departure by Defendant is a reasonable time for protection of the customer information.

4. A restraint on competition would be reasonable limited to the 1200 customers identified in Plaintiff's Exhibit No. 12.

5. The scope of the restrictions as set out in Plaintiff's Exhibit 2 is reasonable except as to sub-paragraph 3(c) and with regard to actions by other employees or employers' agents not under Defendant's supervision.

6. Future and past damages which the Plaintiff may suffer as a result of competition by Defendant utilizing the information of Plaintiff's Exhibit No. 12 cannot be sufficiently ascertained.

7. Plaintiff is entitled to an injunction to protect its interest in the consumer information contained in Plaintiff's Exhibit No. 12.

8. There has been no showing that there was a wrongful appropriation of the information contained in Plaintiff's Exhibit No. 12.

9. Plaintiff is not entitled to exemplary damages.

10. Plaintiff is entitled to reasonable attorneys' fees.

11. Defendant is entitled to an offset of $2,032.75 for unreimbursed expenses.

Martin urges twelve points of error arguing (1) that the trial court "reformed" the parties' agreement in the absence of pleadings seeking reformation; (2) that enforcement of the agreement was "unreasonable" under the facts and that equity should have denied enforcement; (3) that the trial court erred in granting costs of enforcement of the parties' agreement; (4) that the agreement was unenforceable because it was signed only by Martin; and (5)

that the injunction was void because reference to a document outside the judgment was necessary to determine what acts were enjoined.

■ Martin complains that the trial court's election to not enforce "sub-paragraph 3(c)" (see Conclusion of Law No. 5) amounts to a reformation of the parties contract absent pleadings seeking such reformation, citing *Rattan v. Dicker*, 373 S.W. 2d 306, 310 (Tex.Civ.App.—Dallas 1963, no writ). *Rattan* held that reformation of two notes required support of pleadings but we do not find such authority applicable here. Our supreme court in *Weatherford Oil Tool Co. v. Campbell*, 161 Tex. 310, 340 S.W.2d 950 (1960), and more recently in *Hill v. Mobile Auto Trim, Inc.*, 725 S.W.2d 168 (Tex.1987) has held that a court of equity, when presented with a covenant not to compete for enforcement, must only enforce that part of the agreement meeting a test of "reasonableness" under the facts presented. We hold that such selective enforcement does nothing to "reform" the parties' agreement but only enforces that part of the agreement made by the parties found "reasonable" under the record. Denial of relief absent reasonable factual support is not a reformation but a failure in the burden of proof. Pleading for relief encompasses the possibility of denial in absence of proof; consequently, no redundant additional pleading is required.

■ Martin next complains that the agreement, and the enforcement of any part thereof against him, is "unreasonable" in the light of *Hill v. Mobile Auto Trim, Inc.* We cannot agree. *Hill* dealt with a non-compete agreement between a franchiser and its franchise. After reviewing a long line of its own opinions, and those of other appellate courts, the supreme court organizes from such precedent four criteria before a covenant will be held "reasonable" and enforced. Adapted to our record, such criteria may be described as (1) CPA must show it has a legitimate interest in protecting its goodwill; (2) CPA must show that the protection sought is not oppressive to Martin, i.e., neither denies him his labor nor restricts, beyond reason, as to time, territo-

ry, and activity; (3) CPA must show that enforcement is not injurious to the public so as to deprive the public of goods and service; and (4) CPA must show that it gave consideration, or something of value, for Martin's covenant.

Unchallenged statements in the parties' briefs reflect that, while Martin had a familiarity with the cable industry when he was hired by CPA, he "had *no* prior expertise in the debt collection aspect of the business." During his initial employment with CPA, Martin contacted customers for the purpose of soliciting business. Later he employed and supervised sales and office personnel and conducted sales meetings for company salesmen. In 1982, Martin became Vice–President of CPA and gradually assumed considerable control over CPA's day-to-day operation. About that same time, Martin's contact with customers declined and was assumed by field and in-house sales staff. Near the end of his employment with CPA Martin's contract [sic] with customers was not routine. During the entirety of his employment by CPA Martin received a base salary, bonuses, medical insurance, paid vacation, use of a car and expense reimbursement. Additionally, our unchallenged statements reflect that, in addition to Director of Marketing, Martin was Vice President in charge of sales and marketing. Martin supervised a number of CPA's employees and sold in all parts of the United States. He also conducted sales meetings for CPA. Martin traveled extensively for CPA with salesmen and represented CPA at trade conventions. He travelled at least 14 weeks per year. Martin admitted he was the direct contact for CPA with its customers. Martin attended three or four national conventions per year. Martin reported directly to the President of CPA, Nate Levine. Martin's job was to become familiar with the key personnel of the customers of CPA. Martin continued having direct contact with customers during his entire term of employment. He became known as "Mr. CPA." Towards the end of his employment with CPA, Martin was responsible for keeping in touch with the key people of the multi system operators. Martin continued

to have telephone contact with customers all through his employment with CPA. In 1981 Martin was paid $36,858.50, in 1982 $39,739.15, in 1983 $43,153.62, and in 1984 $55,314.25 and $39,587.50 for the first eight (8) months of 1985. Martin while employed by CPA helped generate certain forms used by CPA in maintaining its customer relations and setting prices for its services. Martin admits he had daily access to customer lists and collection evaluation reports. These reports were not available to the public. One of the CPA sales persons supervised by Martin was Tom Stockton, who was one of CPA's leading salesmen. Art Schulman was an employee of Vision Cable, a customer of CPA. Stockton quit CPA on or about September 6, 1985. Over the Labor Day holiday 1985, Stockton came to Dallas and discussed the prospect of organizing a competing company with Martin. Martin also discussed this subject with Schulman at the same time. On September 6, 1985, Martin terminated his employment without prior notice to CPA. Martin, Schulman and Stockton organized Credit Management, Inc. ("CMI") on September 18, 1985. Each were officers, directors and ⅓ owners and the only investors in CMI. Martin signed a three-year non-compete agreement with CMI.

The foregoing recitals, offered by counsel with commendable candor, appear to demonstrate that the criteria in *Hill* are met and support the restraint of Martin as imposed by the trial court. Martin's engagement, training in an unfamiliar field, and the achievement of such imminence as being "Mr. CPA" in four years generated a substantial risk to his employer that Martin would be able to divert all or part of CPA's business to himself. This risk, and the remedy therefore, is described in *Hospital Consultants, Inc. v. Potyka*, 531 S.W.2d 657 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.) as:

> Most courts recognize that an employer has a sufficient interest in retaining his customers to support an employee's covenant whenever the employee's relationship with customers in such that there is a substantial risk that he may be

able to divert all or part of their business. This is the "customer contact" which is discussed, along with its limitations, in *Arthur Murray Dance Studios of Cleveland v. Witter*, 105 N.E.2d 685, 705–09 (Ohio Com.Pl.1952). Clearly, whether the risk is great enough to justify the restriction, and the extent of the permissible restriction, must depend on the extent to which the employee is likely to be identified in the mind of the customer with the product or service being sold. The most important considerations are the frequency of the employee's contacts with customers and whether they are the employer's only contacts or relationships with such customers; the locale of the contact; and the nature of the functions performed by the employee. Blake, *Employee Agreements Not To Compete*, 73 Harv.L.Rev. 625, 659 (1960). 531 S.W.2d at 661.

■ In terms of *Hill*, we find that CPA had a legitimate interest in the "customer contact" acquired by Martin as its employee and executive. We find that Martin was not oppressed by restricting his diversion of CPA customers to himself for three years because the record reflects manifold opportunities to practice his learned skills with other prospects during the period restrained. We find that the public will suffer no injury by Martin's restraint as the same or similar services remain available, as the public itself is free to choose, from both CPA as well as Martin's CMI, as well as other firms offering the same services. Finally, we find that Martin not only received his training from CPA in a new field but was paid generously by CPA while developing his ability to divert CPA's customers, thus showing CPA has given something of value to Martin to justify the modest protection awarded by the trial court.

■ Likewise, under *Hill* this record does not clothe Martin with a "common calling," such as a barber, but, to the contrary, clothes Martin as "Mr. CPA" unique to all CPA customers. The unchallenged statements in the briefs recite that Martin was not in the cable television collection business, nor any collection business, prior to joining CPA. Counsel for Martin stipulated at trial that Martin had solicited customers of CPA. Since leaving CPA, Martin has sold five cable systems of Sammons' Communications which he formerly sold and supervised when he was employed by CPA. The loss of revenue to CPA from these five accounts was expected to be from $75,000.00 to $100,000.00 per year. CPA also lost to Martin 60 systems from the multi system operators Newhouse, Metrovision and Vision. The loss of revenues from all the systems lost to Martin on an annual basis was $598,000.00. Diverting CPA's customers was a risk realized and suffered by CPA and which diversion the trial court, equitably and reasonably, halted by its judgment.

■ Martin next complains that the trial court erred in granting CPA its costs of enforcement of Martin's non-compete agreement. Martin does not deny the parties contracted for such costs to be awarded in "any action at law or equity ... to enforce or interpret the terms" of their agreement. Neither does Martin dispute that Texas precedents permit the enforcement of such an agreement. *See New Amsterdam Casualty Co. v. Texas Industries Inc.*, 414 S.W.2d 914 (Tex.1967). Martin narrowly argues that, since it has taken a trial and an appeal to find out what his agreement was and if such agreement was "reasonable" and, therefore, enforceable, he should not be required to pay costs when he did not have an option to obey a known obligation so as to avoid costs of determination. We cannot agree. Martin's proper options were to obey his contract or to, himself, secure a declaration that such agreement was not binding upon him. Instead, he chose to violate the agreement and risk its enforcement. The trial court did not err in imposing upon Martin the cost of Martin's choice.

■ Martin also complains that the non-compete agreement should not have been enforced since CPA had not executed it. Martin concedes that "while unsigned contracts not otherwise binding can be made so by acts, conduct or acquiescence indicat-

ing a clear interest to be bound" citing *Orgain v. Butler*, 478 S.W.2d 610, 614 (Tex.Civ.App.—Austin 1972, no writ), he urges that this contract "is a matter of public policy" and is "in restraint of trade" and "there is no presumption of validity"; thus it ought to require all formalities in its execution by *both parties*. We cannot agree that this contract is of such a nature as to require a special set of rules, more strict in nature, different from those rules ordinarily applied by the Texas courts or by our legislature. The parties have made the agreement and acted upon it, on both sides, for over two years. Neither can now be heard to complain after enjoying the contract's rewards for such period. *Daniel v. Goesl*, 161 Tex. 490, 341 S.W.2d 892 (1960); *Velasquez v. Schuehle*, 562 S.W.2d 1 (Tex. Civ.App.—San Antonio 1977, no writ).

■ Lastly, Martin complains that the judgment of the trial court violated Rule 683 Texas Rules of Civil Procedure, which requires that (in part):

> Every order granting an injunction ... shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained.

Martin argues that the 1200 accounts he was restrained from contacting were not listed or itemized in the judgment, hence he could not know just what acts he was not to commit. Martin cites *Seline v. Baker*, 536 S.W.2d 631 (Tex.Civ.App.—Houston [1st Dist.] 1976, no writ) in which case a document not in evidence was referred to as describing the activities restrained. Martin was restrained from activities specified in the judgment regarding accounts of CPA. The judgment further recited:

> As used herein "account" shall be deemed to mean and included the 1200 accounts listed and checked in Exhibit 12, admitted in evidence in this cause. Accounts as listed on Exhibit 12 shall mean each individual cable system listed on said list but no cable systems operated by any Multiple Systems Operator ("MSO") listed on said exhibit which are not served by Plaintiff. However, there is exempted from the term "account"

those systems being served by Credit Management, Inc. in accordance with the terms of this Court's Temporary Injunction Order dated February 6, 1986.
> Exhibit 12 filed herein shall be under seal and its use shall be subject to the confidentiality agreement previously approved by the Court.

We do not find the "confidentiality agreement of the parties" nor, by reason thereof, Exhibit 12. We find that the trial court's judgment, when considered in the light of the Exhibit 12 made confidential by Martin's own agreement, to bear reasonable detail as to Martin's in compliance with Rule 683.

By cross points CPA complains: (1) that the trial court should have enforced the parties' agreement *as written* rather than determine what restraint was reasonable; and (2) that the trial court should have awarded CPA damages caused by Martin in soliciting its customers. Finding no reversible error in the record, we affirm the trial court's judgment as to these points.

■ As we read *Hill v. Mobile Auto Trim, Inc.*, the trial court was compelled to limit his restraint to acts he found to be "reasonably" prohibited in the agreement in the light of the facts establishing the criteria provided by *Hill*. The evidence offered by CPA and Martin was in broad dispute, and the trial court's resolution of such dispute by his findings and judgment is supported by the record. In a nonjury case such as this, the trial judge is the fact finder and it is his responsibility to weigh the evidence and judge the credibility of witnesses. *Glassman and Glassman v. Somoza*, 694 S.W.2d 174 (Tex.App.—Houston [14th Dist.] 1985, no writ). No error is shown.

■ The denial of damages to CPA rests upon Conclusion of Law No. 6 that damages could not be "sufficiently ascertained" under the record. CPA urges that the record showed the loss of customers even though the damages could not be shown as mathematically certain. CPA cites *Arabesque Studios, Inc. v. Academy of Fine Arts International, Inc.*, 529 S.W. 2d 564, 569 (Tex.App.—Dallas 1985, no

writ) for authority that absent mathematical certainty should not deny reasonable damages for proven wrong-doing. We agree with *Arabesque;* however, in that case the fact finder was *persuaded* by the evidence offered, and here the fact finder was not so persuaded. We have examined the record and fail to find that the evidence was so clear, so convincing, so free of doubt or inconsistency that the fact finder was compelled, as a matter of law, to award damages. The trial judge may accept or reject the testimony of any witness in whole or in part, and while an appellate court may not have reached the same findings, it may not substitute its judgment for that of the trial court. *Texas West Oil & Gas Corp. v. El Paso Gas Transportation Co.,* 631 S.W.2d 521 (Tex.App.—El Paso 1982, no writ).

AFFIRMED.