DECISION AND JOURNAL ENTRY
Plaintiff-appellant Atlantic Tool Die Co. ("Atlantic") appeals the dismissal of its claims against defendant-appellee Robert F. Kacic relating to a covenant not to compete contained in an employment contract. This Court reverses and remands.
 I.
Kacic began working for Atlantic in October 1984. Atlantic is a tool and die manufacturer. By 1995, Kacic was the quality assurance/operations manager for Atlantic.
On September 27, 1995, Kacic entered into a written employment contract with Atlantic. The contract guaranteed Kacic a certain level of pay, periodic bonuses, some benefits, and specialized training in the quality assurance field. In return, Kacic agreed, in part, to refrain from working for a direct competitor of Atlantic "during the time of his employment and thereafter for a period of eighteen (18) months." The contract was for a term of one year ending on November 30, 1996. The contract automatically renewed itself every year, unless one of the parties gave forty-five days notice of its intention to terminate the contract.
During the summer of 1996, Kacic began negotiating with Die Mension, another tool and die manufacturer, concerning the position of quality assurance manager. On October 8, 1996, immediately after being offered a position with Die-Mension as quality assurance manager, Kacic notified Atlantic that he did not wish to renew the contract for another year. However, Kacic never mentioned Die-Mension's offer and never indicated that he was considering employment with a competitor of Atlantic. On November 30, 1996, the contract terminated. Kacic continued to work for Atlantic until December 27, 1996.
On January 6, 1997, Kacic began working for Die-Mension. Kacic immediately began contacting customers and suppliers of Atlantic. Kacic requested that these customers and suppliers keep his new position with Die-Mension a secret.
Upon learning of Kacic's employment with Die-Mension, Atlantic filed suit against Kacic seeking a permanent injunction to prevent Kacic from working for Die-Mension and monetary damages for breach of contract. Initially, the trial court issued a temporary restraining order. However, after a hearing, the trial court dismissed Atlantic's claims against Kacic, concluding that the employment contract "had been terminated and defendant Kacic's employment continued after such termination and therefore the covenant not to compete no longer was in effect."
Atlantic appeals, raising one assignment of error:
The trial court abused its discretion in refusing to Enforce Kacic's post-employment covenant not to compete through injunction.
 II. Covenant Not to Compete
The trial court concluded that the restrictive covenant was no longer in effect at the time that Kacic began working for Die-Mension because it had expired along with the employment contract. Under this interpretation, the restrictive covenant would only take effect if Kacic breached the employment contract and began working for a direct competitor of Atlantic during the term of the contract. Because the contract explicitly states that the restrictive covenant continues in effect beyond the life of the employment contract, this Court reverses.
It is beyond dispute that post-employment restrictive covenants are generally enforceable in Ohio. See, e.g., Raimonde v. Van Vlerah (1975),42 Ohio St.2d 21, 24 (briefly discussing how and why the law developed to permit restrictive covenants after initially finding them presumptively void); Rogers v. Runfola Associates, Inc. (1991), 57 Ohio St.3d 5, 9
(enforcing a restrictive covenant by enjoining competitive employment for one year from the date of the opinion). See, generally, Arthur MurrayDance Studios of Cleveland, Inc. v. Witter (1952), 62 Ohio Law Abs. 17 (providing an exhaustive review of the law relating to restrictive covenants in employment contracts).
The construction of a contract is a matter of law to be resolved by the courts. Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241, paragraph one of the syllabus. "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." Id. at paragraph two of the syllabus. The covenant not to compete is set forth in paragraph 7.2.c of the contract: "[D]uring the time of his employment and thereafter for a period of eighteen (18) months, Employee shall not engage, consult with, or work for, directly or indirectly, any known direct competitor of the Company * * *." According to the ordinary meaning of the words used in paragraph 7.2.c, Kacic's obligation to refrain from working for a direct competitor of Atlantic continues for eighteen months after his employment with Atlantic ends, regardless of when that occurs.
"[W]here the terms in an existing contract are clear and unambiguous, [courts] cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." Alexander,supra at 246. In this case, the contract is clear and unambiguous — Kacic must refrain from competitive employment for eighteen months after his employment with Atlantic ends. In order to conclude, as the trial court did, that the covenant was contingent upon Kacic departing during the term of the contract, the following italicized language, or something similar, would have to be added: "[D]uring the time of his employment and thereafter for a period of eighteen (18) months, if Employee leaves theCompany during the duration of this employment contract, Employee shall not engage, consult with, or work for, directly or indirectly, any known direct competitor of the Company * * *." With the italicized language included, the force of the covenant would be limited to the duration of the contract. Without the italicized language, there is no limitation. Kacic failed to include any such language. Therefore, as the contract is written, it specifically contemplates that Kacic may continue to work for Atlantic beyond the duration of the employment contract and imposes the covenant without any limitation based upon the timing of Kacic's ultimate departure. Kacic may depart during, at the end of, or ten years after the term of the employment contract; it makes no difference for purposes of applying the covenant. If Kacic intended to condition the covenant based upon the timing of his departure, it was his responsibility to include such language. Having failed to do so, the courts cannot unilaterally impose such a condition without effectively creating a new contract. Therefore, the covenant not to compete is enforceable.
 III. Irreparable Harm
The trial court also found that Atlantic had failed to prove irreparable harm and, thereby, failed to justify the issuance of an injunction. The trial court reasoned that:
[I]t is not credible that customers of a multi-million dollar corporation would switch allegiance and orders to a much smaller company simply because one quality control person changed jobs. There was no evidence that Kacic was a decision maker of plaintiff's company, or privy to any long range planning of the company. Knowledge of customers was not limited to Kacic — anyone in the industry could easily know who was a customer of plaintiff.
The parties agree that the decision to grant or deny an injunction is within the discretion of the trial court. Garono v. State (1988),37 Ohio St.3d 171, 173. In order to obtain an injunction to enforce a covenant not to compete, Atlantic must show that irreparable harm is actually threatened. See Levine v. Beckman (1988), 48 Ohio App.3d 24,27.
The trial court appears to have fixated on the "customer contact" theory of irreparable harm, wherein an employer is harmed by the loss of an employee with strong ties to the customers when the customers follow the employee to the competitor. Arthur Murray Dance Studios, supra at 47. However, "[t]he existence of an actual threat of irreparable injury may [also] be established by showing that the employee possessed knowledge of the employer's trade secrets." Levine, supra at 27. In this case, although Atlantic does allege that Kacic had significant contacts with its customers, Atlantic primarily argues that it will lose business because Kacic's knowledge of Atlantic's quality control systems and training will give Die-Mension a competitive advantage.
Kacic was considered one of the top four people at Atlantic. Kacic played the lead role in developing Atlantic's quality control procedures. Atlantic's superior quality control was the foundation of its business. By hiring Kacic, Die-Mension immediately gained access to Atlantic's quality control systems and training, and could thereby challenge Atlantic for its customers.
Additionally, Atlantic had taken great pains to develop Kacic's abilities in the area of quality control. For instance, Atlantic procured specialized training for Kacic so that it could obtain ISO and QS 9000 certification. These certifications qualify a business to perform certain jobs and work for certain customers. By hiring Kacic after he had already received this training, Die-Mension hampered Atlantic's attempts to gain certification and greatly increased its own chances of doing so.
In summary, by hiring Kacic, Die-Mension immediately raised its quality control to a level rivaling that of Atlantic without expending the time and resources necessary to develop a comparable quality control program on its own. Therefore, the addition of Kacic gives Die-Mension a competitive advantage over Atlantic, thereby threatening Atlantic with irreparable harm through the loss of customers.
The trial court also implied that the disparity in size between Atlantic and Die-Mension will prevent customers from changing loyalties. However, with Kacic and his abilities, Die-Mension has greatly increased the likelihood that an Atlantic customer will switch to Die-Mension. That increased likelihood could eventually eliminate the size disparity between Atlantic and Die-Mension, which is precisely why Atlantic sought to restrict Kacic from working for a direct competitor. Also, the record contained substantial evidence that Die-Mension is actively pursuing Atlantic's customers.
Additionally, the contract contains a clause, similar to a liquidated damages clause, which states that:
Employee acknowledges that the Company's remedies at law will not be sufficient to protect it against irreparable harm suffered in the event of a breach by the Employee of this Paragraph 7 [containing the covenant not to compete] and, accordingly, Employee agrees and covenants that in addition to any other remedies the Company may have for such breach, it shall be entitled to injunctive relief and/or specific performance.
Although neither party has addressed this clause on appeal, and the trial court failed to address it below, this clause may prevent Kacic from litigating the existence of irreparable harm. See Gittings v. Baker
(1853), 2 Ohio St. 21, 23-24 ("Parties may * * * agree that certain facts exist, without other proof of their existence * * * or may admit, generally, that the issue joined is against him, and suffer judgment without an investigation of the facts.")
In summary, Atlantic has proven a threat of irreparable harm. Therefore, the trial court abused its discretion in denying an injunction.
 IV. Conclusion
Kacic, knowing that he was bound by a covenant not to compete, first began negotiating with Die-Mension in the summer of 1996. Kacic did not inform Atlantic that he planned to terminate the contract until Die-Mension had already offered him a job. Once he was at Die-Mension, Kacic began contacting customers and suppliers of Atlantic, requesting that these customers and suppliers keep his new position with Die-Mension a secret. The trial court rewarded Kacic for this chicanery — it permitted him to walk away from the contract having received all of the benefits, but without having borne any of the burdens. This sort of result can only encourage this type of deception.
This Court reverses and remands for an evaluation of the reasonableness of the covenant not to compete pursuant to the guidelines set forth inRaimonde, supra, and for the issuance of an appropriate injunction.
Judgment reversed and remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this court, directing the County of Medina, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellee.
Exceptions.
Slaby, P.J. Concurs